**ORAL ARGUMENT NOT YET SCHEDULED**

**Nos. 22-60266, 22-60425, 22-60433, & 22-60434**

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CALUMET SHREVEPORT REFINING, LLC, ET AL.,
Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
Respondent.

On Petition for Review of Final Agency Action
Of the U.S. Environmental Protection Agency

**SECOND CORRECTED BRIEF OF RENEWABLE FUEL PRODUCERS
AS INTERVENORS IN SUPPORT OF THE RESPONDENT**

SETH P. WAXMAN
DAVID M. LEHN
MICHAEL MOORIN
WILMER CUTLER PICKERING
 HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
seth.waxman@wilmerhale.com
david.lehn@wilmerhale.com
michael.moorin@wilmerhale.com

*Counsel for Growth Energy*

MATTHEW W. MORRISON
SHELBY L. DYL
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036-3006
(202) 663-8036
matthew.morrison@pillsburylaw.com
shelby.dyl@pillsburylaw.com

*Counsel for Renewable Fuels Association,
Growth Energy, American Coalition for
Ethanol, National Farmers Union, and
National Corn Growers Association*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Circuit Rule 28.2.1, the following is a list of those persons, associations of person, firms, partnership, corporations, or entities known to the undersigned whose participation in a case may raise a recusal issue.

1. **Allegiance Refining, LLC,** is a Texas limited liability company. Allegiance Refining, LLC, is a refining operations company and operator of Petitioner The San Antonio Refinery LLC. Allegiance Refining, LLC, is not publicly traded, and no publicly held company has a ten percent or greater ownership interest in it.

2. **American Coalition for Ethanol ("ACE"),** Intervenor, is a non-profit trade association. Its members include ethanol and biofuel facilities, agricultural producers, ethanol industry investors, and supporters of the ethanol industry. ACE promotes the general commercial legislative, and other common interests of its members. ACE does not have a parent company and issues no stock. is a non-profit trade association. Its members include ethanol and biofuel facilities, agricultural producers, ethanol industry investors, and supporters of the ethanol industry. ACE promotes the general commercial legislative, and other common interests of its members. ACE does not have a parent company and issues no stock.

3. **Bromer, Alexandra Magill,** Perkins Coie LLP, counsel for Petitioners Calumet Shreveport Refining, LLC; Ergon Refining, Inc.; Ergon-West Virginia, Inc.; The San Antonio Refinery LLC; and Placid Refining Company LLC.

4. **Calumet Refining, LLC,** a limited liability company formed under the laws of Delaware, is owned 100 percent by Calumet Specialty Products Partners, L.P. On November 10, 2019, Calumet Refining, LLC, completed the sale to Starlight Relativity Acquisition Company LLC of all of the issued and outstanding membership interests in Calumet San Antonio Refining, LLC, now named The San Antonio Refinery LLC, a Petitioner.

5. **Calumet Specialty Products Partners, L.P.**, parent of Petitioner Calumet Shreveport Refining, LLC, is incorporated under the laws of

Delaware. Calumet Specialty Products Partners, L.P., is a refiner of petroleum products and a publicly traded company. The Heritage Group owns 12.28 percent of the common stock of Calumet Specialty Products Partners, L.P., and there are no other known persons or entities that own more than ten percent of it. Calumet Specialty Products Partners, LP, holds 100 percent ownership of Calumet Refining, LLC.

6.  **CVR Refining, LLC,** parent of Petitioner Wynnewood Refining Co., LLC, is incorporated under the laws of the State of Delaware and is a wholly owned subsidiary of CVR Refining, LP.

7.  **CVR Refining, LP,** is incorporated under the laws of the State of Delaware and is an indirect wholly owned subsidiary of CVR Energy, Inc.

8.  **CVR Energy, Inc.,** is incorporated under the laws of the State of Delaware and is publicly traded on the New York Stock Exchange under the symbol "CVI."

9.  **Dyl, Shelby L.,** Pillsbury Winthrop Shaw Pittman LLP, counsel for Intervenors Renewable Fuels Association, Growth Energy, American Coalition for Ethanol, National Farmers Union, and National Corn Growers Association.

10. **Ergon, Inc.** is the parent company of Petitioners Ergon Refining, Inc., and Ergon-West Virginia, Inc., and no publicly held company has a 10 percent or greater ownership interest in it.

11. **Ergon Refining, Inc.,** Petitioner, is incorporated under the laws of Mississippi and is a refiner of petroleum products. Ergon Refining, Inc., is wholly owned by parent company Ergon, Inc. No publicly held company has a ten percent or greater ownership interest in it.

12. **Ergon-West Virginia, Inc.,** Petitioner, is incorporated under the laws of Mississippi and is a refiner of petroleum products. Ergon-West Virginia, Inc., is wholly owned by parent company Ergon, Inc. No publicly held company has a ten percent or greater ownership interest in it.

13. **Gershenfeld, Andrew K.,** White & Case LLP, counsel for Petitioner Wynnewood Refining Company, LLC.

14. **Growth Energy,** Intervenor, is a non-profit trade association. Its members are ethanol producers and supporters of the ethanol industry. It operates to promote the general commercial, legislative, and other common interests of its members. Growth Energy does not have a parent company and issues no stock.

15. **Hardin, Jonathan G.,** Perkins Coie LLP, counsel for Petitioners Calumet Shreveport Refining, LLC; Ergon Refining, Inc.; Ergon-West Virginia, Inc.; The San Antonio Refinery LLC; and Placid Refining Company LLC.

16. **Harrison, Bryan J.,** Attorney, United States Department of Justice, counsel for Respondent United States Environmental Protection Agency.

17. **Hershey, Samuel P.,** White & Case LLP, counsel for Petitioner Wynnewood Refining Company, LLC.

18. **Huston, Michael R.,** Perkins Coie LLP, counsel for Petitioners Calumet Shreveport Refining, LLC; Ergon Refining, Inc.; Ergon-West Virginia, Inc.; The San Antonio Refinery LLC; and Placid Refining Company LLC.

19. **Icahn Enterprises, LP,** and its affiliates ("IEP") hold a ten percent or greater ownership interest in CVR Energy Inc. IEP is a publicly traded partnership.

20. **Jacobi, Patrick R.,** Attorney, United States Department of Justice, counsel for Respondent United States Environmental Protection Agency.

21. **Lauria, Thomas E.,** White & Case LLP, counsel for Petitioner Wynnewood Refining Company, LLC.

22. **Lehn, David M.,** Wilmer Cutler Pickering Hale and Dorr LLP, counsel for Intervenor Growth Energy.

23. **Morical, Gregory J.,** Calumet Shreveport Specialty Products Partners, LP, counsel for Petitioner Calumet Shreveport Refining, LLC.

24. **Moorin, Michael,** Wilmer Cutler Pickering Hale and Dorr LLP, counsel for Intervenor Growth Energy

iv

25.   **Morrison, Matthew W.,** Pillsbury Winthrop Shaw Pittman LLP, counsel for Intervenors Renewable Fuels Association, Growth Energy, American Coalition for Ethanol, National Farmers Union, and National Corn Growers Association.

26.   **National Corn Growers Association ("NCGA"),** Intervenor, is a non-profit trade association. Its members are corn farmers and supporters of the agriculture and ethanol industries. NCGA promotes the general commercial, legislative, and other common interests of its members. NCGA does not have a parent company and issues no stock.

27.   **National Farmers Union ("NFU"),** Intervenor, is a non-profit trade association. Its members include farmers who produce biofuel feedstocks and consume large quantities of fuel. The NFU promotes the general commercial, legislative, and other common interests of its members. It does not have a parent company and issues no stock.

28.   **Placid Holding Company** is a parent of Petitioner Placid Refining Company LLC.

29.   **Placid Refining Company LLC,** Petitioner, is a limited liability company organized under the laws of Delaware and is a refiner of petroleum products. Placid Refining Company LLC is owned 100 percent by its parent companies Placid Holding Company and RR Refining, Inc., and no publicly held company has a ten percent or greater ownership interest in it.

30.   **Renewable Fuels Association ("RFA"),** Intervenor, is a non-profit trade association. Its members are ethanol producers and supporters of the ethanol industry. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Renewable Fuels Association does not have a parent company and issues no stock.

31.   **RR Refining, Inc.,** is a parent of Petitioner Placid Refining Company LLC.

32.   **The San Antonio Refinery LLC,** Petitioner, is a Delaware limited liability company (f/k/a Calumet San Antonio Refining, LLC) and is a refiner of petroleum products. The San Antonio Refinery LLC is owned 100 percent by Allegiance Refining, LLC.

33. **Shah, Sopen B.,** Perkins Coie LLP, counsel for Petitioners Calumet Shreveport Refining, LLC; Ergon Refining, Inc.; Ergon-West Virginia, Inc.; The San Antonio Refinery LLC; and Placid Refining Company LLC.

34. **United States Environmental Protection Agency,** Respondent.

35. **Waxman, Seth P.,** Wilmer Cutler Pickering Hale and Dorr LLP, counsel for Intervenor Growth Energy.

36. **Wolff, Eric B.,** Perkins Coie LLP, Perkins Coie LLP, counsel for Petitioners Calumet Shreveport Refining, LLC and The San Antonio Refinery LLC.

37. **Worsham, Karl J.,** Perkins Coie LLP, counsel for Petitioners Calumet Shreveport Refining, LLC; Ergon Refining, Inc.; Ergon-West Virginia, Inc.; The San Antonio Refinery LLC; and Placid Refining Company LLC.

38. **Wynnewood Refining Co., LLC,** Petitioner, is incorporated under the laws of the State of Delaware and is a wholly owned subsidiary of CVR Refining, LLC.

Intervenors will file a revised certificate of interested persons should they become aware of a change in corporate ownership interests that would affect the disclosures required by Federal Rule of Appellate Procedure 26.1 and Fifth Circuit Rule 28.2.1.

Dated: June 29, 2023                                  /s/ *Shelby L. Dyl*
                                                                Shelby L. Dyl

## STATEMENT REGARDING ORAL ARGUMENT

Intervenors Renewable Fuel Association ("RFA"), American Coalition for Ethanol ("ACE"), Growth Energy, National Farmers Union ("NFU"), and National Corn Growers Association ("NCGA") request oral argument. Intervenors believe that the Court would benefit from argument addressing the application of 42 U.S.C. § 7607(b)(1)'s venue provision to the agency actions challenged here.

If the Court reaches the merits, the petitions raise complex legal and record issues. The administrative record includes a significant amount of technical material, including economic analysis. Adjudicating the merits of the petitions for review will therefore require the Court to consider many complex issues and a substantial amount of information. The Court would therefore benefit from oral argument.

Dated: June 29, 2023                                   /s/ *Shelby L. Dyl*
                                                       Shelby L. Dyl

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ........................................... vii

TABLE OF CONTENTS ..................................................................................... viii

TABLE OF AUTHORITIES ...................................................................................x

STATEMENT OF ISSUES .....................................................................................1

INTRODUCTION ...................................................................................................1

STATEMENT OF THE CASE ...............................................................................4

   A. The Renewable Fuel Standard Program and Small Refinery
     Exemptions ......................................................................................................4

   B. The 2016-2018 SREs.....................................................................................5

   C. EPA's April and June Denials........................................................................7

   D. Judicial Challenges ........................................................................................8

ARGUMENT ..........................................................................................................8

I.  VENUE IS IMPROPER ...................................................................................8

II. EPA'S DECISIONS ARE NOT IMPERMISSIBLY RETROACTIVE
    AND DO NOT VIOLATE PETITIONERS' DUE PROCESS RIGHTS ............9

   A. Because the Denials Were Adjudications, EPA Had to Apply its
     Current Approach ..........................................................................................10

   B. EPA Was Justified in Not Withholding the Retroactive Effect (If Any)
     of the 2019-2021 Denials .............................................................................12

     i.  Petitioners Could Not Have Reasonably Relied on EPA's Prior
       Approach Because It Was Neither Clear Nor Settled ..............................13

     ii.  The Denials' Have No Retroactive Effect Anyway, But
       Regardless, Their Effect Will Not Prejudice Petitioners ........................17

     iii. Withholding the Denials' Retroactive Effect Would Undermine the
       Congressional Interests Behind the RFS Program ...................................23

     iv. Withholding the Denials' Retroactive Effect Would Harm
       Renewable Fuel Producers .......................................................................25

III.EPA'S APPROACH IS STATUTORILY REQUIRED ...................................26

A. EPA's Statutory Interpretation and RIN Passthrough Finding Neither Eliminate nor Contravene the Statute's Exemption Provision......................26

B. The Statute Supports EPA's Interpretation of "Disproportionate Economic Hardship"......................................................................................28

C. EPA's Interpretation Was Directed by the Tenth Circuit in *RFA* .................29

D. EPA Complied with its Obligation to Consult with DOE..............................30

E. EPA's Evaluation of the SRE Petitions Was Sufficiently Individualized ..............................................................................................31

CONCLUSION......................................................................................................32

CERTIFICATE OF COMPLIANCE.......................................................................34

CERTIFICATE OF SERVICE ...............................................................................35

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Advanced Biofuels Ass'n v. EPA*,
  792 F. App'x. 1 (D.C. Cir. 2019).........................................................................15

*Aliceville Hydro Assocs. v. FERC*,
  800 F.2d 1147 (D.C. Cir. 1986)..........................................................................26

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019).....................................................................25, 26

*Ams. for Clean Energy v. EPA*,
  864 F.3d 691 (D.C. Cir. 2017).....................................................10, 24, 25, 26

*Arizona Grocery Co. v. Atchison*,
  284 U.S. 370 (1932)....................................................................................11, 12

*Arkema, Inc. v. EPA*,
  618 F.3d 1 (D.C. Cir. 1987)................................................................................10

*Bosamia v. Comm'r*,
  661 F.3d 250 (5th Cir. 2011) .....................................................................13, 24

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)....................................................................................11, 12

*Cassell v. FCC*,
  154 F.3d 478 (D.C. Cir. 1998)...................................................................15, 22

*Catholic Health Initiatives Iowa Corp. v. Sebelius*,
  718 F.3d 914 (D.C. Cir. 2013)...........................................................................11

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947)....................................................................................11, 12

*Clark-Cowlitz Joint Operating Agency v. F.E.R.C.*,
  826 F.2d 1074 (D.C. Cir. 1987)..................................................................11, 25

*De Niz Robles v. Lynch*,
803 F.3d 1165 (10th Cir. 2015) ...........................................................12

*FCC v. Fox Tel. Stations, Inc.*,
567 U.S. 239 (2012)............................................................................20

*Gahagan v. United States Citizenship & Immigration Servs.*,
911 F.3d 298 (5th Cir. 2018) ..............................................................31

*Gen. Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995).............................................................20

*Growth Energy v. EPA*,
5 F.4th 1 (D.C. Cir. 2021)....................................................................4

*Growth Energy v. EPA*,
No. 22-1126 (D.C. Cir. Apr. 10, 2023)................................................18

*Hermes Consol., LLC v. EPA*,
787 F.3d 568 (D.C. Cir. 2015).............................................................31

*HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*,
141 S. Ct. 2172 (2021)............................................................7, 28, 30

*Hunt Refin. Co. v. EPA*,
No. 22-11617 (11th Cir. filed May 12, 2022) ......................................8

*Kern Oil & Refin. Co. v. EPA*,
2022 WL 3369528 (9th Cir. Aug. 16, 2022) ......................................24

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994)............................................................................20

*McDonald v. Watt*,
653 F.2d 1035 (5th Cir. 1981) .......................................11, 14, 17, 24

*McLellan v. Miss. Power & Light Co.*,
545 F.2d 919 (5th Cir.1977) ...............................................................30

*Microcomputer Tech. Inst. v. Riley*,
139 F.3d 1044 (5th Cir. 1998) ......................................................13, 17

*Monroe Energy, LLC v. EPA*,
750 F.3d 909 (D.C. Cir. 2014) ............................................... 16, 19, 26

*Monteon-Camargo v. Barr*,
918 F.3d 423 (5th Cir. 2019) ....................................................... 13, 18

*Nat'l Petrochem. & Refiners Ass'n v. EPA*,
630 F.3d 145 (D.C. Cir. 2010) ............................................... 19, 21, 23

*NLRB v. Wyman-Gordon Co.*,
394 U.S. 759 (1969) .......................................................................... 11

*Optical Workers' Union v. NLRB*,
227 F.2d 687 (5th Cir. 1955) ............................................................. 12

*Qwest Servs. Corp. v. FCC*,
509 F.3d 531 (D.C. Cir. 2007) ........................................... 11, 16, 22, 26

*Renewable Fuel Ass'n v. EPA*,
No. 19-1220 (D.C. Cir. filed Oct. 22, 2019) ................................... 6, 16

*Renewable Fuels Ass'n v. EPA*,
948 F.3d 1206 (10th Cir. 2020) ................................. 4, 6, 12, 15, 26

*Renewable Fuels Ass'n v. EPA*,
No. 18-9533 (10th Cir. filed May 29, 2018) ...................................... 5

*Retail, Wholesale & Dep't Store Union v. NLRB*,
466 F.2d 380 (D.C. Cir. 1972) ........................................................... 14

*S. Cal. Edison Co. v. FERC*,
805 F.2d 1068 (D.C. Cir. 1986) ......................................................... 14

*S. Ill. Power Coop. v. EPA*,
863 F.3d 666 (7th Cir. 2017) ............................................................... 9

*Sinclair Wyo. Refin. Co. v. EPA*,
887 F.3d 986 (10th Cir. 2017) .................................................... 15, 30

*Sinclair Wyo. Refin. Co. v. EPA*,
No. 22-1073 (D.C. Cir. filed May 3, 2022) ........................................ 8

*Verizon Tel. Co. v. FCC*,
    269 F.3d 1098 (D.C. Cir. 2001)..................................................................12, 14

*Williams Natural Gas Co. v. FERC*,
    3 F.3d 1544 (D.C. Cir. 1993).............................................................................14

## Statutes and Codes

United States Code
    Title 42, section 7545(o)(2)(A)(i)...........................................................................4
    Title 42, section 7545(o)(9)(A)(ii)(I)..................................................................32
    Title 42, section 7545(o)(9)(B)(i)......................................................4, 27, 30, 32
    Title 42, section 7607(b)(1) .................................................................................1

## Other Authorities

Federal Register
    86 Fed. Reg. 70,999 (Dec. 14, 2021)...........................................................20, 21
    87 Fed. Reg. 54,158 (Sept. 2, 2022).....................................................19, 23, 28
    87 Fed. Reg. 80,582 (Dec. 30, 2022)...................................................................19

## STATEMENT OF ISSUES

1.    Whether venue is improper under 42 U.S.C. §7607(b)(1) because EPA's April and June 2022 denials of small refinery exemptions (the "Denials") are either "nationally applicable" or "based on a determination of nationwide scope or effect" made and published by EPA.

2.    Whether the Denials are impermissibly retroactive or violate Petitioners' due process rights.

3.    Whether the approach EPA applied in the Denials is authorized by the Clean Air Act.

4.    Whether the Denials are reasonable and reasonably explained as required by the Administrative Procedure Act.

## INTRODUCTION

This Court should not review Petitioners' challenge to EPA's denial of their petitions for small refinery exemptions ("SREs"). The Clean Air Act ("CAA") establishes the D.C. Circuit as the sole venue for challenging the "Denials" because EPA has determined correctly that they are "nationally applicable" and that they have nationwide scope or effect. Indeed, a consolidated case of challenges to the same EPA actions brought by 40 refineries, including Petitioners, is currently pending in the D.C. Circuit.

Regardless, the petitions should be denied. First, the Denials are not impermissibly retroactive. Petitioners conflate the standards for retroactive agency rulemakings and *adjudications*. Because SRE petitions are adjudications, EPA had no choice but to apply its current approach to deny Petitioners' SRE petitions. EPA had discretion to withhold only the retroactive *effect* of the Denials—i.e., their economic consequences—but it could do so only if "the ills of retroactivity" outweigh "the disadvantages of prospectivity." Here, they do not. Petitioners had no basis to rely on EPA's earlier approach, which had been articulated, if at all, only in nonprecedential adjudications, and which was already subject to judicial review when Petitioners submitted the SRE petitions at issue—review that eventually confirmed that that prior approach was unlawful.

Nor were Petitioners prejudiced by EPA's application of its current policy. With respect to the 2017-2018 SRE petitions, EPA already fully withheld the Denials' effect by excusing Petitioners from having to retire any additional RINs to meet their RFS obligations for those years. That relief in fact allows Petitioners to keep a windfall—the premium they received through the sale of their petroleum without having to incur the offsetting RIN-compliance costs—notwithstanding the fact that such relief exceeds EPA's statutory authority, harms renewable-fuel producers, and contravenes Congress's aim of using the RFS to increase the use of renewable fuel. Petitioners want the same treatment for their 2019-2021 obligations.

But EPA gave Petitioners ample time and opportunity to conform their SRE petitions to EPA's current approach, and ample time to comply with their 2019-2021 RFS obligations after the Denials and before any penalties would be imposed. Moreover, again, withholding the Denials' effect would exceed EPA's authority, undermine the RFS program, and harm renewable fuel producers.

Second, EPA's approach to evaluating SRE petitions is not only reasonable, but also legally required. EPA revised its approach in response to several years of legal challenges, including a Tenth Circuit decision holding that EPA's prior approach violated both the CAA and administrative law. EPA's current approach gives effect to the statutory requirement that SREs be available only to small refineries that demonstrate "disproportionate economic hardship," and concludes that no small refineries demonstrated disproportionate economic hardship caused by RFS compliance.

Finally, EPA's denials were sound on the record. EPA's factual findings regarding RIN recoupment are well supported by the record, consistent with its statutory duty to consult with the U.S. Department of Energy ("DOE") and consider DOE's 2011 study, and sufficiently individualized to provide discrete consideration of their SRE petitions.

## STATEMENT OF THE CASE

**A.    The Renewable Fuel Standard Program and Small Refinery Exemptions**

Through the RFS, Congress established "mandatory and annually increasing quantities of renewable fuels that must be introduced into commerce … each year—and tasks the EPA Administrator with 'ensur[ing]' that those annual targets are met." *Growth Energy v. EPA*, 5 F.4th 1, 7 (D.C. Cir. 2021) (quoting 42 U.S.C. §7545(o)(2)(A)(i)). Congress allowed "small refineries" to "petition" EPA for "exemption" from their RFS obligations "for the reason of disproportionate economic hardship." 42 U.S.C. §7545(o)(9)(B)(i). The effect of an SRE is that the RFS obligations "shall not apply to [that] refiner[y]" for that year. *Id.* §7545(o)(9)(A)(i), (B)(i).

In 2015, EPA found, based on an empirical study, that refineries "recoup RFS compliance costs." *Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206, 1255 (10th Cir. 2020) ("*RFA*"). EPA explained that although refineries incur "a direct and obvious cost in obtaining RINs," they "are generally able to recover the cost of meeting their RIN obligations in the price of their petroleum blendstocks," which they sell. JA402 ; *see RFA*, 948 F.3d at 1255.

In December 2016, EPA issued a guidance memorandum stating that it "may only grant such [SRE] petitions if … the small refinery will experience a 'disproportionate economic hardship' from compliance with its RFS obligations"

and that it "evaluat[es] whether RFS compliance would cause the small refinery 'disproportionate economic hardship.'" JA399-400 ("2016 Memo"). The 2016 Memo also stated that "since 2011, … EPA has adopted the interpretation of disproportionate economic hardship set forth in the [Department of Energy] Small Refinery Study," JA400 n.5, which in turn defined the task as "evaluat[ing] disproportionate economic hardship caused by the impact of compliance with the RFS on small refineries," accounting for "[t]he degree to which [RIN purchase costs] will be passed through." JA296, JA307, JA327-28.

### B.    The 2016-2018 SREs

In May 2018, associations of biofuels producers, including some of the intervenors in this action, petitioned the Tenth Circuit to review three SREs that EPA granted for 2016-2017. Petition for Review, *Renewable Fuels Ass'n v. EPA*, No. 18-9533 (10th Cir. filed May 29, 2018), ECF #10562569. Through this case, it became clear that, in granting those SREs, EPA had departed from the approach stated in the 2016 Memo.

In June 2018, EPA began receiving SRE petitions for 2018. *See* JA2758, JA2767 ("June 2022 Alternative Compliance Action"); Pet'rs Br. 18, 23-24. In August 2019, EPA granted 31 of those petitions, including Petitioners', applying the same approach it had newly applied to the three 2016-2017 SREs challenged in the Tenth Circuit case. Pet'rs Br. 18-19. In October 2019, a group of biofuels

representatives, including intervenors, petitioned the D.C. Circuit for review of the 31 2018 SREs. *See* Petition for Review, *Renewable Fuel Ass'n v. EPA*, No. 19-1220 (D.C. Cir. filed Oct. 22, 2019), ECF #1812533.

On January 24, 2020, the Tenth Circuit vacated the three 2016-2017 SREs for multiple reasons and remanded them to EPA. It held that EPA had exceeded its statutory authority by "[g]ranting extensions of exemptions based at least in part on hardships not caused by RFS compliance." *RFA*, 948 F.3d at 1253-54. The court said the statute requires that RFS "compliance must be the cause of any disproportionate hardship." *Id.* The court also held that it was arbitrary and capricious for EPA to have "ignored or failed to provide reasons for deviating from prior studies showing that" refineries "can recoup RFS compliance costs by passing them on to customers." *Id.* at 1255-57. Finally, it held that EPA had exceeded its statutory authority by granting SREs to refineries that were not exempt in all prior years, but that holding was reversed by the Supreme Court. *HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172 (2021).

After the Supreme Court ruled in *HollyFrontier*, the D.C. Circuit remanded the 31 2018 SREs to "allow EPA the opportunity to reconsider its action in light of [the Tenth Circuit's and Supreme Court's] intervening decisions." Motion for Voluntary Remand Without Vacatur, *Renewable Fuels Ass'n*, No. 19-1220 (D.C.

Cir. Aug. 25, 2021), ECF #1911606, at 2; *id.*, ECF #1925942 (order granting EPA's motion to remand).

### C.    EPA's April and June Denials

In April 2022, EPA denied 36 SRE petitions, including the 31 remanded by the D.C. Circuit. April 2022 Denial of Petitions for RFS Small Refinery Exemptions ("April Denial"), JA3. "[I]n response to the conclusion of [the Tenth Circuit case] that addressed historical inconsistencies in EPA's treatment of SREs since 2011," EPA clarified its approach by correcting the two remaining errors identified by the Tenth Circuit in *RFA*—that EPA lacked the authority to consider hardships that were not the result of compliance with the RFS and that it was arbitrary and capricious for EPA to find disproportionate hardship without considering its prior findings that refineries recover their RFS compliance costs. JA6, JA31, JA53-63. In June 2022, EPA followed the same approach to deny 69 more SRE petitions for 2016-2021, including the three SREs that had been vacated by the Tenth Circuit in *RFA*. June 2022 Denial of Petitions for RFS Small Refinery Exemptions ("June Denial"), JA148-58 (together with the April Denial, the "Denials").

After the Denials, the impacted small refineries had "unmet 2016-2018 compliance obligations." JA2758, JA2769, JA2777. To "mitigate" the supposed "burdens" of those obligations, EPA concurrently but separately determined that it would deem those refineries, including Petitioners, to be in compliance with their

2016-2018 obligations "without retiring any additional RINs." *Id.* at JA2762, JA2770-71. EPA referred to its forgiveness of RFS obligations as the "alternative compliance demonstration approach." *Id.* at JA2762.

### D. Judicial Challenges

After the Denials, a series of legal challenges ensued. Forty small refineries, including Petitioners, filed petitions for review in the D.C. Circuit challenging both the April and June Denials. *Sinclair Wyo. Refin. Co. v. EPA*, No. 22-1073 (D.C. Cir. filed May 3, 2022), ECF#1973398. And various refineries have filed similar suits challenging the same actions with respect to their SRE petitions around the country; this case is one of them. *See also Hunt Refin. Co. v. EPA*, No. 22-11617 (11th Cir. filed May 12, 2022). The suits filed in the Third, Seventh, Ninth, and Tenth Circuits were either dismissed or transferred for lack of venue, in favor of the D.C. Circuit. *See Sinclair Wyo.*, No. 22-1073 (D.C. Cir. filed Oct. 31, 2022), ECF #1971464, at 7-12.

## ARGUMENT

## I. VENUE IS IMPROPER

EPA is correct that the D.C. Circuit has exclusive venue to hear a petition for review of the Denials. EPA Br. 24-26; ECF #31. Allowing regional-circuit review would mean that potentially nine "circuit courts could rule on issues arising from a single, national EPA [action], utterly defeating the statute's obvious aim of centralizing judicial review of national rules in the D.C. Circuit." *S. Ill. Power Coop.*

*v. EPA*, 863 F.3d 666, 673 (7th Cir. 2017). That there are already suits challenging the same approach—the same interpretation and the same findings about RIN costs—in three circuits highlights the serious risk of inconsistent and irreconcilable judgments, and thus the necessity of funneling judicial review into a single court, the D.C. Circuit. Consequently, this Court should dismiss the case, or, in the alternative, transfer the case to the D.C. Circuit.

## II.  EPA'S DECISIONS ARE NOT IMPERMISSIBLY RETROACTIVE AND DO NOT VIOLATE PETITIONERS' DUE PROCESS RIGHTS

Petitioners' retroactivity and due process arguments reflect the wrong governing standard, a mistaken understanding of the history of EPA's SRE policy, and confusion about the effects of the Denials.

Because adjudications are inherently retroactive, EPA was required to adjudicate Petitioners' SRE petitions under its current approach. An agency may nonetheless withhold the retroactive *effect*—i.e., "economic consequences"—of a new policy under very limited circumstances. Those circumstances are absent here. EPA's prior approach was not a clear, settled rule on which Petitioners could have reasonably relied. Rather, it had been applied only in nonprecedential adjudications, contradicted EPA's previously articulated policy, was subject to judicial review before Petitioners filed their SRE petitions, and was plainly unlawful, as the Tenth Circuit thereafter held. Moreover, EPA gave Petitioners ample opportunity to conform their petitions to the approach EPA ultimately applied in the Denials, and

then ample time to comply with their RFS obligations after the Denials. Additionally, EPA completely relieved Petitioners of their 2017-2018 RFS obligations following the denial of their SRE petitions for those years, even though such relief was at odds with the RFS program's purpose of increasing the use of renewable fuel and would correspondingly harm renewable-fuel producers. Extending that relief to 2019-2021 would only amplify those harms to the RFS program and renewable-fuel producers.

### A. Because the Denials Were Adjudications, EPA Had to Apply its Current Approach

Petitioners invoke case law involving retroactive rulemaking, *see, e.g.*, Pet'rs Br. 35 (citing *Arkema, Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 1987)); *id.* at 30, 40 (citing *Ams. for Clean Energy v. EPA* ("*ACE*"), 864 F.3d 691, 718, 719, 721 (D.C. Cir. 2017)), but the Denials are administrative adjudications, not rulemakings, Pet'rs Br. 57; therefore, a different standard for retroactivity applies. "[I]t is black-letter administrative law that adjudications are inherently retroactive." *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 922 (D.C. Cir. 2013); *see also NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 763-766 (1969) (administrative adjudication must involve retroactive application of rule, or else it would be rulemaking); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 224 (1988) (Scalia, J., concurring) (*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) shows that "retroactivity is not only permissible but standard" in adjudication because that "deals with what

the law was; rulemaking deals with what the law will be"); *McDonald v. Watt*, 653 F.2d 1035, 1044 (5th Cir. 1981) ("underlying the court's entire discussion in *Chenery* was the assumption that adjudication is always retroactive"); *Clark-Cowlitz Joint Operating Agency v. F.E.R.C.*, 826 F.2d 1074, 1081 (D.C. Cir. 1987) (en banc); *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 539 (D.C. Cir. 2007). Thus, when "a rule [is] announced in an agency adjudication, … the rule itself … *must* have retroactive effect"; an agency can announce a prospective rule only through the rulemaking process. *Catholic Health*, 718 F.3d at 922 (emphasis supplied).

Quoting *Arizona Grocery Co. v. Atchison*, 284 U.S. 370, 389 (1932), Petitioners argue EPA "cannot 'act in its quasi judicial capacity' to 'retroactively repeal' its own prior legal standard." Pet'rs Br. 36. That is incorrect. As this Court has explained, *Arizona Grocery* at most "defined the powers of" the Interstate Commerce Commission; "it did not establish a principle of general application, for essentially the same question was decided differently in … *Chenery*." *Optical Workers' Union v. NLRB*, 227 F.2d 687, 690 (5th Cir. 1955); *see also Verizon Tel. Co. v. FCC*, 269 F.3d 1098, 1107 (D.C. Cir. 2001) ("*Arizona Grocery* deals only with the power of the ICC to award reparations to shippers for unreasonable rates that they had paid to carriers.").[1] Regardless, *Arizona Grocery* is irrelevant because,

---

[1] In *Chenery*, the Supreme Court held that the agency was not "forbidden from utilizing" adjudication "for announcing and applying a new standard of conduct,"

as explained below, the approach EPA applied in the Denials was not preceded by a contrary *rule*; to the extent EPA had applied a different approach previously, it did so only in nonprecedential adjudications. "[W]here no pre-existing interpretive rule construing those requirements is in effect, nothing prevents the agency from acting retroactively through adjudication." *Bowen*, <u>488 U.S. at 224</u>.

That also refutes Petitioners' reliance on *De Niz Robles v. Lynch*, <u>803 F.3d 1165, 1172-1173</u> (10th Cir. 2015). Pet'rs Br. 36. Unlike the situation addressed there, the contrary approach EPA applied in previously granting SREs was not an exercise of EPA's lawmaking power entitled to *Chevron* deference, *see RFA*, <u>948 F.3d at 1244</u>.[2] Moreover, unlike in *De Niz Robles*, EPA has not merely revised its resolution of statutory ambiguity from one reasonable position to another. As explained by the Tenth Circuit and EPA's brief, EPA's prior position was unlawful and its current position is *mandated* by the CAA and the Administrative Procedure Act. *See* EPA Br. 48-75.

### B.    EPA Was Justified in Not Withholding the Retroactive Effect (If Any) of the 2019-2021 Denials

In the context of an adjudication, an agency may withhold the retroactive effect of its policy or rule only if "the ills of retroactivity" outweigh "the

---

and "[t]hat such action might have a retroactive effect was not necessarily fatal to its validity." <u>332 U.S. at 202</u>.

[2] On the contrary, as EPA explains, it is its current approach that merits *Chevron* deference even if not statutorily required. EPA Br. 47-48.

disadvantages of prospectivity." *Microcomputer Tech. Inst. v. Riley*, 139 F.3d 1044, 1050 (5th Cir. 1998). On one side, the Court "examine[s] the extent of the agency's departure from previous interpretation and the reasonableness of the aggrieved party's reliance," as well as the degree of harm from retroactivity. *Id.* 1050-52. On the other side, the Court considers "the mischief of allowing the previous—now incorrect—interpretation to stand," including "the statutory or regulatory interest in retroactivity" and harm to other parties from nonretroactivity. *Id.* at 1050 (cleaned up); *see also, e.g.*, *Monteon-Camargo v. Barr*, 918 F.3d 423, 430 (5th Cir. 2019). Here, the balance is lopsided in favor of retroactivity. *See, e.g.*, *Bosamia v. Comm'r*, 661 F.3d 250, 257 (5th Cir. 2011) ("Commissioner was justified in changing its policy with retroactive effect because" "Commissioner [had not] previously adopted an explicit position on this question," but even he had, "(1) his interpretation is plainly reasonable and (2) the detrimental effect of prospectivity—partial frustration of what we have now determined is the proper statutory interpretation—outweighs the … frustration of parties' expectations") (cleaned up).

### i.   Petitioners Could Not Have Reasonably Relied on EPA's Prior Approach Because It Was Neither Clear Nor Settled

The policy applied in the Denials does not "'represent an abrupt departure from well established practice of the agency.'" *McDonald*, 653 F.2d at 1045 (quoting *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972)). Indeed, there was no established prior policy of crediting hardships not caused by

RFS compliance or of disregarding RIN-cost recoupment on which Petitioners could have relied, let alone have relied reasonably.

To qualify as "old law that was reasonably relied on," the prior approach must have "expressly address[ed] th[e] precise issue," *S. Cal. Edison Co. v. FERC*, 805 F.2d 1068, 1071 & n.4 (D.C. Cir. 1986), been "consistent" and "well-established," *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C. Cir. 1993) (cleaned up), been "authoritatively articulated outside of the same … proceeding in which it was eventually reversed," *Verizon*, 269 F.3d at 1100, and been "judicially confirmed." *Id.* And where the prior approach was "under unceasing challenge, … reliance is typically not reasonable." *Id.* at 1104.

As EPA has acknowledged, however, when Petitioners submitted the SRE petitions at issue, EPA's approach to evaluating them had been "inconsisten[t]." JA7. Before Petitioners submitted their 2017 and 2018 SRE petitions, *see* Pet'rs Br. 23-24, EPA's last public articulation of its policy was its 2016 Memo, which stated that the requisite hardship had to be caused by RFS compliance and that, based on the 2011 DOE Study, RIN-cost recoupment had to be accounted for—the same policy EPA applied in the Denials. *See* JA400 (requiring, *inter alia,* documentation on the effect of compliance costs on the ability of the refinery to remain financially viable and profitable); *see also RFA*, 948 F.3d at 1248.

Although EPA applied Petitioners' preferred approach in granting some SREs in 2017 and early 2018, Petitioners could not have justifiably relied on those refinery-specific decisions or the approach they reflected. First, those SRE decisions "were neither published nor even publicly acknowledged." *Advanced Biofuels Ass'n v. EPA*, 792 F. App'x. 1, 3 (D.C. Cir. 2019). Second, those SRE decisions "ha[d] no precedential value" for anyone—neither for "third parties" (who would not have known about them anyway) nor "even for the [recipient] refiner"—"since each petition must be resolved on a case-by-case basis." *Sinclair Wyo. Refin. Co. v. EPA*, 887 F.3d 986, 992 (10th Cir. 2017). Given that "the *status quo ante* was not a benchmark at all, but rather a case-by-case assessment with a highly uncertain outcome," any "reliance" on prior exemption grants "was badly misplaced." *Cassell v. FCC*, 154 F.3d 478, 486 (D.C. Cir. 1998).

Likewise, Petitioners could not have relied on the fact that EPA had previously granted their prior SRE petitions. Refineries have no right to an exemption, but rather are subject to the RFS obligations unless they demonstrate that the SRE requirements are met each time they petition. *See Monroe Energy, LLC v. EPA*, 750 F.3d 909, 920 (D.C. Cir. 2014) ("The statute set the renewable fuel obligation, and Monroe Energy had no legally settled expectation that EPA would exercise its waiver authority to reduce that obligation."). Indeed, EPA already had told petitioning refineries they "should always presume that they are subject to the

requirements of the RFS program and include RFS compliance in their overall planning" until their exemption has been granted. JA401.

Third, by the time Petitioners filed their 2018-2021 SRE petitions, the approach EPA had used in its recent SRE grants (which Petitioners claims to have relied upon) was already subject to judicial challenge. *Compare* Petition for Review, *Renewable Fuels Ass'n*, No. 18-9533 (10th Cir. May 29, 2018), ECF #10562569, *with* Pet'rs Br. 23-24. In addition, a second lawsuit challenging that approach as applied to grant the 2018 SREs was filed before all but one Petitioner had submitted their 2019-2021 SRE petitions. *See Renewable Fuels Ass'n v. EPA*, No. 19-1220 (D.C. Cir. filed Oct. 22, 2019). "[O]nce the issue was expressly drawn into question[,] … [one] could [not] possibly find that [the refineries] reasonably relied upon" the prior approach. *Qwest*, 509 F.3d at 540 (cleaned up).

And fourth, Petitioners' preferred approach was, for reasons later explained by the Tenth Circuit, plainly unlawful. *See supra* at 6-7. Plus, the Tenth Circuit reached that conclusion in January 2020, *id.*, before Petitioners filed their SRE petitions for 2020 and 2021, *see* Pet'rs Br. 23-24.

The cases that Petitioners rely upon are inapposite. In *McDonald*, the Court found that the revised policy was "an abrupt departure" because the agency had followed the prior interpretation through multiple authoritative statements and in practice over the preceding decade and had never contradicted that position. 653

F.2d at 1037, 1039-1040, 1045. Likewise, in *Microcomputer*, the agency had issued a written memorandum reciting its "long standing policy" and stating that any changes to that policy "would be made only by prospective regulations." 139 F.3d at 1051.

In short, Petitioners could not have had a settled, legally protected expectation that EPA would apply Petitioners' preferred approach in evaluating Petitioners' 2018-2021 SRE petitions. Tellingly, 23 of the 31 refineries that petitioned for a 2018 SRE did not rely on the approach EPA had used in granting the 2016-2017 SREs, but instead chose to retire RINs to comply with their 2018 obligations fully or partially while awaiting EPA's decision on their petitions. *See* JA2758, JA2767.

### ii. The Denials' Have No Retroactive Effect Anyway, But Regardless, Their Effect Will Not Prejudice Petitioners

The Denials' effect is entirely prospective, but even if viewed as retroactive, it would not significantly harm Petitioners.

The Denials have no retroactive effect with respect to Petitioners' 2017-2018 obligations because EPA already fully withheld any such effect by relieving Petitioners of their duty to retire any more RINs to meet those obligations through the April and June Compliance Actions. (In a separate pending case, Intervenor Growth Energy has challenged EPA's legal authority to take an "alternative compliance approach" with respect to an unsuccessful SRE petition. *See* Br. for

17

Growth Energy, *Growth Energy v. EPA*, No. 22-1126 (D.C. Cir. Apr. 10, 2023), ECF #1994071, at 18-26).

And the Denials have no retroactive effect with respect to any of Petitioners' 2017-2021 obligations because the Denials do not penalize Petitioners for now having unmet obligations for that time period, *cf. Monteon-Camargo*, 918 F.3d at 430 (changed policy would alter legal consequences of prior guilty pleas), but rather merely require Petitioners to acquire the specified number of RINs in the future (to the extent they had not already done so) and retire them to show compliance. Importantly, EPA gave Petitioners ample notice of its approach before applying it to deny their SRE petitions, and gave Petitioners "ample notice that [they] would need to accumulate RINs to meet" their obligations and ample time to acquire those RINs. *NPRA*, 630 F.3d at 163. Specifically, whereas EPA issued the Denials in April and June 2022, EPA provided an extended and orderly schedule for Petitioners to comply with their associated obligations: Petitioners were not required to demonstrate compliance with their 2019 obligations until September 1, 2022 (and could carry forward any 2019 deficit to the 2020 deadline); were not required to begin demonstrating compliance with their 2020 obligations until February 2023 to complete compliance until February 2024; and were not required to demonstrate compliance with their 2021 obligations until March 2023. *Alternative RIN Retirement Schedule for Small Refineries,* 87 Fed. Reg. 54,158, 51,462 (Sept. 2,

2022); EPA Br. 19-20. That is plenty of time for Petitioners to acquire enough RINs to meet their obligations (to the extent they had not already done so). *See* 87 Fed. Reg. at 54,161, 54,162; 87 Fed. Reg. 80,582, 80,605 (Dec. 30, 2022). Therefore, as in prior RFS situations, because EPA issued its Denials "well before the [effective] compliance demonstration deadline, … [it] did not change the legal effect of a completed course of conduct" and thus was not "retroactive." *Monroe Energy*, 750 F.3d at 920.[3] For the same reasons, EPA is correct that the Denials did not infringe upon any due process right of Petitioners. *See* EPA Br. 26-29.

However, Petitioners contend that EPA failed to provide notice by changing the consequences of its conduct after Petitioners had supposedly "relied on EPA's prior approach" in two ways. Pet'rs Br. 29. First, Petitioners claims to have relied upon EPA's prior approach when they "prepared their hardship petitions." *Id.* Such reliance would have been unreasonable for all the reasons stated above, but in any event, Petitioners' claimed reliance is not credible. Before denying Petitioners' SRE petitions, EPA publicly announced its intention to adopt the approach it eventually applied. *See* 86 Fed. Reg. 70,999 (Dec. 14, 2021). In that announcement, EPA

---

[3] Moreover, as Petitioners' citations show, Pet'rs Br. 29-30, 34-39, the "fair notice" doctrine Petitioners invoke applies to legislative action (*see, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)) and to punitive action (*see, e.g.*, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1330 (D.C. Cir. 1995); *FCC v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 253-58 (2012)), but does not preclude retroactivity in adjudication. Regardless, as explained above, EPA afforded ample notice.

invited "comment on all aspects of this proposed denial, most notably" on the key feature of the policy it was clarifying: its "conclusions that the CAA requires small refineries to demonstrate that [disproportionate economic hardship] is caused by compliance with the RFS program[, its] economic analyses concluding that no small refineries face such disproportionate costs of compliance due to the RFS program," and its "findings regarding RIN cost passthrough." 86 Fed. Reg. at 71,000. EPA also solicited "additional data that would show the relationship between RFS compliance costs and the price of transportation fuel blendstocks." *Id*. EPA also directly invited the refineries, including Petitioners, to submit supplemental information relevant to EPA's proposed approach; Petitioners obliged with six supplemental submissions each. EPA Br. 13. EPA therefore afforded Petitioners notice and ample opportunity to conform their SRE petitions to EPA's approach. *Cf.* Pet'rs Br. 35 (citing *Satellite Bd. Co. v. FCC*, 824 F.2d 1, 3-4 (D.C. Cir. 1987)).

Second, Petitioners claims to have relied on EPA's prior approach to "determine their compliance strategy." Pet'rs Br. 29. But Petitioners do not claim that they determined the amount of renewable fuel to use or the amount of RINs to acquire in reliance on EPA's prior approach. Even if they had, however, such a "frustrat[ion]" of their "expectations … cannot furnish a sufficient basis for identifying impermissibly retroactive rules." *Nat'l Petrochem. & Refiners Ass'n v. EPA*, 630 F.3d 145, 159, 161 (D.C. Cir. 2010) ("*NPRA*").

Moreover, to the extent Petitioners have not already acquired RINs for 2019-2021 compliance (or 2017-2018), they have enjoyed a "financial *benefit* through the sale of [their] petroleum fuel that includes the value of the RIN but no associated RFS compliance costs." JA179 (emphasis supplied). Having to meet their RFS obligations will simply eliminate that windfall. Petitioners nonetheless complain that because of EPA's "delays," they will have to pay more for the RINs than the premium they received through the sale of their earlier petroleum fuels, meaning they will not recoup the difference. Pet'rs Br. 14-15. But RIN prices rose principally because EPA denied more SRE petitions than the market expected it to, constricting the RIN supply relative to demand, not because EPA denied the petitions *retroactively* or at a particular moment in time. Further, any marginal difference in RIN prices is a happenstance with no legal significance. As Petitioners' data show, RIN prices fluctuate, *see* Pet'rs Br. 24, and Petitioners could not have had a settled expectation that they would remain below a certain level. Indeed, RIN prices today could have been lower, giving Petitioners a windfall even after meeting their obligations.

EPA concluded that had Petitioners collected RINs ratably during the compliance years—i.e., acquired the appropriate number of RINs concurrently with their introduction of petroleum fuel into commerce—they would have recouped their costs. *See* JA219. Thus, Petitioners paying more now is a consequence of their

"gamble" of trying to get SREs under a judicially challenged and plainly unlawful approach; it certainly "was not a sure bet." *Cassell*, 154 F.3d at 486; *see also Qwest*, 509 F.3d at 540 (stating "that a party may have relied on its own (rather convenient) assumption that unclear law would ultimately be resolved in its favor is insufficient to defeat the presumption of retroactivity when that" does not pan out).

If the notice and time to comply EPA afforded Petitioners were insufficient, EPA also mitigated the Denials' effect by "preserv[ing]" a bank of 1.8 billion carryover RINs for Petitioners "to comply with their 2020, 2021, and 2022 obligations." [June Alternative Compliance Action] at 14-15; *see NPRA*, 630 F.3d at 164-165 (availability of carryover RINs mitigates any harm from retroactive obligations). On top of that, EPA provided Petitioners "a broader range of RIN vintages" to meet their 2020 obligations; whereas ordinarily a RIN is valid only during the year of generation and the following year, EPA is allowing Petitioners to use RINs from 2019-2024 to meet their 2020 obligations. 87 Fed. Reg. at 54,160.

Petitioners evidently believe, however, EPA was required to *completely eliminate* the 2019-2021 obligations through an "alternative compliance action" like the one EPA used to relieve Petitioners of their 2017-2018 obligations. *See* Pet'rs Br. 42. As noted, EPA's legal authority to issue such an action is the subject of pending litigation, *see supra* at 18, but even if EPA has the authority to issue such an action, EPA properly declined to do so with respect to Petitioners' 2019-2021

obligations. *See* 87 Fed. Reg. at 54,162-63. As EPA explained, unlike with respect to the 2017-2018 obligations, the "compliance period" for 2019-2021 "remains open," affording "both an opportunity for continued RIN acquisitions and retirements, as well as sufficient RINs available to demonstrate compliance." JA2758, JA2778.[4]

Lastly, Petitioners assert that EPA was "require[d]" to "'minimize the hardship caused to obligated parties by virtue of EPA's delay.'" Pet'rs Br. 40 (quoting *ACE*, 864 F.3d at 718, 719, 721). That is wrong for two reasons. First, *ACE* required only that EPA "adequately consider[] various ways to" minimize the hardships of retroactivity, if any. 864 F.3d at 718-19, 721. Second, *ACE*'s standard governs retroactive *rulemaking*, which as discussed above, does not apply here.

### iii.    Withholding the Denials' Retroactive Effect Would Undermine the Congressional Interests Behind the RFS Program

EPA withholding the Denials' retroactive effect for 2019-2021 would "frustrate" the "statutory purpose which the agency has perceived to be advanced by" the Denials. *Watt*, 653 F.2d at 1044. Thus, any "detrimental effect of

---

[4] Petitioners mention the Ninth Circuit's holding in *Kern Oil & Refin. Co. v. EPA*, 2022 WL 3369528 (9th Cir. Aug. 16, 2022), that EPA had to compensate a small refinery for the delay in adjudicating its SRE petition, but that case is nothing like this one. Unlike Petitioners, Kern had complied with its RFS obligations while its SRE petition was pending, and then EPA granted the petition. Accordingly, EPA was obligated to give Kern the full benefit of its exemption. *See id.* at *1.

prospectivity … outweighs the [supposed] disadvantages of retroactivity." *Bosamia,* 661 F.3d at 257.

Congress enacted the RFS "in order to 'move the United States toward greater energy independence and security' and 'increase the production of clean renewable fuels.'" *ACE*, 864 F.3d at 697 (quoting Pub. L. 110-140, 121 Stat. 1492 (2007)). To achieve these goals, "Congress intended the Renewable Fuel Program to be a market forcing policy that would create demand pressure to increase the consumption of renewable fuel." *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 568 (D.C. Cir. 2019) ("*AFPM*") (quotation marks omitted). EPA determined that the Denials would "increase demand for renewable fuels in the future." JA2728, JA2748 ("April 2022 Alternative Compliance Action"), which directly advances Congress's goals. *Id.*; *ACE*, 864 F.3d at 697.

SREs diminish these goals by reducing the amount of renewable fuel that is blended into the U.S. gasoline supply each year, *AFPM*, 937 F.3d at 571, which is why Congress authorized EPA to grant SREs only when refineries met specific statutory requirements. Because "[w]ithholding retroactive application [of the Exemption Denials] would grant [the refineries] a … benefit to which [EPA] now believes [they are] not entitled"—the release from their unmet 2019-2021 RFS obligations—non-retroactivity would "not … fulfill[]" the "overriding

Congressional interest" in providing for exemptions. *Clark-Cowlitz*, 826 F.2d at 1085.

### iv.    Withholding the Denials' Retroactive Effect Would Harm Renewable Fuel Producers

Additionally, withholding the Denials' retroactive effect would be inappropriate because it "would impose an equal burden" on others. *Aliceville Hydro Assocs. v. FERC*, 800 F.2d 1147, 1153 (D.C. Cir. 1986). Every RIN that the Denials would require Petitioners to retire "is matched by an equal and opposite los[t gallon of renewable fuel] that non-retroactivity … would inflict on" renewable-fuel producers. *Qwest*, 509 F.3d at 540.

Specifically, withholding the Denials' effect would harm the producers of renewable fuel used to comply with the RFS program. The RFS volume requirements define the national "demand" for renewable fuel. *ACE*, 864 F.3d at 705; *Monroe Energy*, 750 F.3d at 917. SREs relieve certain obligated parties of their RFS obligations, and thus depress the demand for renewable fuel, "creat[ing]" a "renewable-fuel shortfall." *AFPM*, 937 F.3d at 568, 571. Any RINs that would otherwise be used to meet those exempted or relieved obligations become available to meet future RFS obligations in place of physical volumes of renewable fuel, thereby suppressing the use of renewable fuel in that future year.

## III.    EPA'S APPROACH IS STATUTORILY REQUIRED

EPA's interpretation of the statute that a small refinery must suffer hardship *caused by RFS compliance* to qualify for an SRE is not only reasonable and the "best" interpretation of the statute; it is also the *required* interpretation. *See RFA*, 948 F.3d at 1253-54; EPA Br. 39-48. Moreover, its accounting for the recoupment of RINs impacted by the Denials is required by administrative law. Petitioners' counterarguments are meritless.

### A.    EPA's Statutory Interpretation and RIN Passthrough Finding Neither Eliminate nor Contravene the Statute's Exemption Provision

Petitioners argue that EPA's statutory interpretation "effectively eliminated statutory hardship exemptions" because, as this Court recently said in ruling on a stay motion, 'no small refinery will ever qualify for one.'" Pet'rs Br. at 43 (quoting Unpublished Stay Order at 8, *Calumet Shreveport LLC v. EPA*, Case No. 22-60266 (5th Cir. Jan. 27, 2023) (order granting motion to stay pending appeal)). That is wrong. EPA's interpretation means only that RFS compliance must cause disproportionate economic hardship. That is a reasonable—indeed, the only reasonable—interpretation of the CAA's provision stating that a "small refinery may at any time petition … for an … exemption [from its RFS obligations] for the reason of disproportionate economic hardship." 42 U.S.C. §7545(o)(9)(B)(i).

Petitioners' concern that there will no longer be hardship exemptions does not stem from that interpretation (which is agnostic as to whether the RFS causes small refineries hardship), but rather from EPA's further factual determination that small refineries recoup their RIN costs. But EPA has not said that refineries will always and forever do so, only that the empirical evidence shows they do so now. Petitioners cite EPA's statement that small refineries "'should have no reasonable expectation that [their future] SRE petition[s] will be granted,'" Pet'rs Br. at 43 (quoting 87 Fed. Reg. at 54,161 n.27); however, all EPA meant was that refineries should comply with their RFS obligations unless and until EPA has granted their SRE petition, which, as always, requires "a compelling demonstration" that the petition is meritorious. 87 Fed. Reg. at 54,161 n.27. If Petitioners demonstrate in the future that they face disproportionate economic hardship caused by RFS compliance, EPA's statutory interpretation would not stand in the way of granting exemptions.

Moreover, even if refineries always continue to recoup their costs, resulting in denials of all future SRE petitions, that would not render EPA's approach in conflict with Congress's intent as expressed in the statute. There is no reason to believe Congress knew whether or not that would be the case when it enacted the exemption program. Rather, Congress provided for relief *if* it turned out that the RFS would inflict disproportionate economic hardship on small refineries. *HollyFrontier*, which Petitioners cites, does not require otherwise. Pet'rs Br. 44; *see* 141 S. Ct. at

2181. There, the Supreme Court held only that a small refinery could be eligible for an exemption for one year even if it was not exempt in the prior year. *See HollyFrontier*, 141 S. Ct. at 2181.

### B.    The Statute Supports EPA's Interpretation of "Disproportionate Economic Hardship"

Petitioners argue that EPA "unlawfully redefined the key statutory term" of "disproportionate economic hardship" by equating "economic hardship" with "RFS compliance costs," without considering conducting a "holistic" analysis that accounts for "other economic factors." Pet'rs Br. 45. EPA did no such thing. Rather, EPA "evaluated and considered many 'other economic factors,' including, but not limited to, the dynamics and characteristics of the fuels and RIN markets, publicly available price data, confidential financial and other refinery-specific data submitted by the petitioning small refineries, and all the data other commenters submitted on the Proposed Denial." JA168-69. After considering all that, EPA nonetheless determined that RIN recoupment conclusively showed the refineries do not suffer disproportionate economic hardship *because of* their RFS compliance, as statutorily required. *Id.* Thus, contrary to Petitioners' contention, Pet'rs Br. 46-47, the SRE Denials do not replace the "disproportionate economic hardship" inquiry with a more stringent inquiry, such as requiring "a threat of closure," *Sinclair Wyo.*, 887 F.3d at 997.

Petitioners next argue that "EPA tries to smuggle a vague severity requirement into the statute" by "insisting that small refineries' disproportionate compliance costs must be 'of sufficient magnitude to warrant the exemption.'" Pet'rs Br. 46. But while Petitioners cast the "sufficient magnitude" concept as replacing or adding to the statute's "disproportionate hardship" requirement, that requirement merely *reflects* the statutory "disproportionate hardship" requirement. That is, EPA's attention to the magnitude of the disproportionate economic harm reflects the basic reality that some economic harms will be too small to qualify as a "hardship," as statutorily required, and so EPA rightly insists that the disproportionate economic harm be substantial enough to rise to the level of *hardship*. *See* 42 U.S.C. §7545(o)(9)(B)(i).

## C.    EPA's Interpretation Was Directed by the Tenth Circuit in *RFA*

Petitioners claim that EPA's reliance on *RFA* is a mistake of law. Pet'rs Br. 46-48. That is wrong. The Tenth Circuit's holding was based on three independent grounds, only one of which was appealed to the Supreme Court. *See* Pet. for Certiorari at i, *HollyFrontier Cheyenne Refining Co. v. EPA*, 141 S. Ct. 2172 (2021). The other two *RFA* holdings—on which EPA based its new statutory interpretation—remain intact. S*ee McLellan v. Miss. Power & Light Co.,* 545 F.2d 919, 925 n. 21 (5th Cir. 1977) ("It has long been settled that all alternative rationales for a given result have precedential value."); *Gahagan v. United States Citizenship*

*& Immigration Servs.*, [911 F.3d 298, 302](#) (5th Cir. 2018) (circuit court precedent remains in force unless Supreme Court decision "unequivocally overrule[s] prior precedent").

Indeed, after *HollyFrontier*, EPA informed the Tenth Circuit that, absent contrary direction, it would "proceed in accordance with its current understanding" that "the alternate holdings in [*RFA*] were not addressed by the Supreme Court … remain in effect." *RFA*, No. 18-9533 (10th Cir. filed May 29, 2018), ECF #010110564301, at 6-7. The court did not disabuse EPA of its understanding. *Id.*, ECF #010110567206.

### D.    EPA Complied with its Obligation to Consult with DOE

Petitioners assert that EPA "failed to meaningfully consult with the Department of Energy, as the statute requires." Pet'rs Br. 49. But "[a]s long as EPA consults with DOE and considers the 2011 Study and other economic factors"—and here, it did—"EPA retains substantial discretion to decide how to evaluate hardship petitions." *Hermes Consol., LLC v. EPA*, [787 F.3d 568, 575](#) (D.C. Cir. 2015).

Petitioners acknowledge that DOE concurred with EPA's conclusions on the petitions, Pet'rs Br. 51, but apparently takes issue with the scope of DOE's participation. The CAA, however, does not delineate the form that EPA's consultation with DOE must take or the actions EPA must take in response. [42 U.S.C. §7545(o)(9)(B)(i)](#). Thus, EPA's representation that it "consulted with DOE

through discussions in meetings and phone conversations regarding the SRE petitions, the supplemental supporting information the small refineries provided, other comments submitted in response to the Proposed Denial, and the analysis and determinations that supply the basis for" the Denial is more than sufficient to satisfy its statutory consultation obligation. JA175.

Petitioners also criticize EPA's decision not to adhere to the 2011 DOE Study and the related scoring matrix. Pet'rs Br. 49-50. But it was *DOE* that "did not apply the scoring matrix." JA174. Moreover, EPA was required only to "consider" the study, 42 U.S.C. §7545(o)(9)(A)(ii)(I), and it did so, declining to follow the DOE study only after carefully examining it and concluding it rested on faulty assumptions. *See* JA175-76. The CAA does not require EPA to credit a report it knows to be deficient.

## E.   EPA's Evaluation of the SRE Petitions Was Sufficiently Individualized

Petitioners contend that EPA failed to evaluate their SRE petitions on an individual basis. Pet'rs Br. 52-55. That is not so. Although the SRE Decisions expressly recite only "overall findings" that small refineries, like all obligated parties, recoup their RFS compliance costs, EPA explained that that was "due to the confidential nature of much of the information included in the SRE petitions," not due to a lack of consideration of individualized evidence. JA209. In fact, the Denials explain that EPA "reviewed the information in the petitions and the supplemental

information provided by small refineries in their comments," and that EPA's "responses to any refinery-specific data" are presented in the "confidential, refinery-specific appendices" attached to the Decision. *Id.* at 209-10. EPA concluded that "nothing presented in [the supplemental information submitted by Petitioners or any other disappointed refinery] le[d] [EPA] to conclude that the small refineries are affected by RFS compliance differently than other obligated parties or that they are not able to pass along RFS compliance costs to wholesale purchasers." *Id.* at 211.

In other words, EPA determined that its general finding about RIN-cost recoupment applied equally to each Petitioner after examining all the evidence before it that was specific to Petitioners. That is a sound and sufficiently individualized adjudication of Petitioners' SRE petitions. There is no further individualized analysis that EPA could have engaged in, and Petitioners identify none. And certainly, the formality of issuing one decision document covering numerous petitions does not violate the statute. Indeed, the original decision to grant Petitioners and others' 2018 petitions—which Petitioners praise—was similarly issued in a single document covering numerous petitions by various refineries. JA1086.

## CONCLUSION

Petitioners' petitions for review should be denied.

Dated: June 29, 2023

SETH P. WAXMAN
DAVID M. LEHN
MICHAEL MOORIN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
seth.waxman@wilmerhale.com
david.lehn@wilmerhale.com
michael.moorin@wilmerhale.com

*Counsel for Growth Energy*

Respectfully submitted,

/s/ *Shelby L. Dyl*

MATTHEW W. MORRISON
SHELBY L. DYL
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036-3006
(202) 663-8036
matthew.morrison@pillsburylaw.com
shelby.dyl@pillsburylaw.com

*Counsel for Renewable Fuels Association,
Growth Energy, American Coalition for
Ethanol, National Farmers Union, and
National Corn Growers Association*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of <u>Fed. R. App. P. 32(a)(7)(B)</u> because, excluding the parts of the document exempted by <u>Fed. R. App. P. 32(f)</u>, this document contains 7,339 words. This document complies with the typeface requirements of <u>Fed. R. App. P. 32(a)(5)(A)</u> and the type-style requirements of <u>Fed. R. App. P. 32(a)(6)</u>.

Dated: June 29, 2023                     /s/ *Shelby L. Dyl*
                                          Shelby L. Dyl

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 29, 2023                            /s/ *Shelby L. Dyl*
                                                Shelby L. Dyl