# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 22, 2023

Lyle W. Cayce
Clerk

————————

No. 22-60266

————————

CALUMET SHREVEPORT REFINING, L.L.C.;
PLACID REFINING COMPANY, L.L.C.;
ERGON REFINING, INCORPORATED;
WYNNEWOOD REFINING COMPANY, L.L.C.,

*Petitioners*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*,

CONSOLIDATED WITH

————————

No. 22-60425

————————

WYNNEWOOD REFINING COMPANY, L.L.C.;
CALUMET SHREVEPORT REFINING, L.L.C.;
SAN ANTONIO REFINERY, L.L.C.;

*Petitioners*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*,

CONSOLIDATED WITH

_____

No. 22-60433

_____

ERGON REFINING, INCORPORATED;
ERGON-WEST VIRGINIA, INCORPORATED,

*Petitioners*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*,

CONSOLIDATED WITH

_____

No. 22-60434

_____

PLACID REFINING COMPANY, L.L.C.,

*Petitioner*,

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondent*.

---

Petitions for Review of Actions of
the Environmental Protection Agency
Agency Nos. 87 Fed. Reg. 24300,
87 Fed. Reg. 34873, EPA-420-R-22-011,
87 Fed. Reg. 34873,
87 Fed. Reg. 34873

---

Before Higginbotham, Smith, and Elrod, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Six small refineries[1] ("petitioners") challenge the EPA's decision to deny their requested exemptions from their obligations under the Renewable Fuel Standard ("RFS") program of the Clean Air Act ("CAA"). The EPA denied petitioners' years-old petitions using a novel CAA interpretation and economic theory that the agency published in December 2021. We conclude that the denial was (1) impermissibly retroactive; (2) contrary to law; and (3) counter to the record evidence. We grant the petitions for review, vacate the challenged adjudications, deny a change of venue, and remand.

## I.

### A. *Statutory and Regulatory Background*

In 2005 and 2007, Congress amended the CAA, 42 U.S.C. § 7401 *et seq.*, to establish the RFS.[2] That program mandates annual increases in "applicable volumes" of four categories[3] of renewable fuel for the transpor-

---

[1] (1) Calumet Shreveport Refining, L.L.C. ("Calumet"); (2) Placid Refining Company, L.L.C. ("Placid"); (3) Ergon Refining, Incorporated ("Ergon"); (4) Wynnewood Refining Company, L.L.C. ("Wynnewood"); (5) The San Antonio Refinery, L.L.C. ("TSAR"); and (6) Ergon-West Virginia, Incorporated ("Ergon-WV").

[2] *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594; Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492.

[3] (1) renewable fuel; (2) advanced biofuel; (3) cellulosic biofuel; and (4) biomass-

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

tation sector. *Id.* § 7545(*o*)(2)(B)(i)(I)–(IV).

To implement the RFS, Congress delegated to EPA the authority to (1) set annual renewable fuel percentage standards and (2) establish an RFS compliance program. *See id.* § 7545(*o*)(3), (7). EPA sets the annual percentage standards based on the amount of renewable fuel needed to meet the statutorily stipulated volume requirements in § 7545(*o*)(2). Obligated parties—refiners, blenders, and importers of transportation fuel—use that annual-percentage standard to determine their volume obligations for the four categories of renewable fuel. *See* 40 C.F.R. § 80.1406. Obligated parties must satisfy their individual volume obligations by the RFS annual compliance date set by EPA. *Id.* § 80.1451(f)(1)(i)(A).

EPA tracks obligated parties' RFS compliance with a credit-trading program. Credits are called Renewable Identification Numbers ("RINs"). There are two ways blenders may acquire RINs: *First*, they can generate RINs by blending renewable fuel into conventional fuel. *See id.* § 80.1429(b). That's because RINs are "attached" to the renewable fuel the obligated party buys for its blending operation. Once blending has occurred, the RIN "separates" and exists independently of any batch of fuel. *See id.* §§ 80.1425–29. *Second*, obligated parties can meet their annual volume obligations by purchasing RINs from other obligated parties. *See generally id.* §§ 80.1425–29; 42 U.S.C. § 7545(*o*)(5)(B).

RINs are generally fungible—with one catch. A RIN may be used for compliance only during the calendar year in which it was generated or the calendar year following. 40 C.F.R. § 80.1427(a)(6)(i); *see also id.* §§ 80.1428(c), 80.1431(a)(iii). For example, a RIN that was created in 2018 can be used only to meet an obligated party's 2018 or 2019 RFS volume

_____

based diesel. 42 U.S.C. § 7545(*o*)(2)(B)(i)(I)–(IV).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

obligations. *See id.* § 80.1427(a)(6).[4]  Obligated parties demonstrate they have met their volume obligations—thereby complying with RFS—by "retiring" their RINs at their annual compliance demonstration. *Id.* § 80.1427(a)(1).

Congress, recognizing that RFS might impose disproportionate economic hardship on "small refineries"[5] from RFS, created three exemptions from the compliance regime:

- *First* is the blanket exemption, which automatically exempted all small refineries from RFS until 2011. 42 U.S.C. § 7545(*o*)(9)(A)(i).

- *Second* is the refinery-specific exemption initiated by the Secretary of Energy.  If, after conducting the statutorily mandated Department of Energy study, the Secretary determined that a small refinery was subject to a disproportionate economic hardship, "the Administrator shall extend the exemption under clause (i) for the small refinery for a period of not less than 2 additional years." *Id.* § 7545(*o*)(9)(A)(ii).

- *Third*, the subparagraph (B) exemption allows small refineries to "petition the Administrator for an extension under subparagraph (A) for the reason of disproportionate economic hardship." *Id.* § 7545(*o*)(9)(B)(i). "In evaluating a petition . . . the Administrator, in consultation with the Secretary of Energy, shall consider the findings of the study under subparagraph (A)(ii) and other economic factors." *Id.* § 7545(*o*)(9)(B)(ii).

––––––––––––––––––––––

[4] That is not to say that a RIN generated in 2018 becomes valueless in 2020—RINs do not turn into pumpkins after their expiration date.  An unretired 2018 RIN remains transactable in 2023 to the extent other obligated parties create demand for RINs that can be used to meet 2018 or 2019 compliance year requirements. *See id.* §§ 80.1427(a)(6), 80.1428(c), 80.1431(a).

[5] The CAA defines small refineries as those "for which the average aggregate daily crude oil throughput for a calendar year (as determined by dividing the aggregate throughput for the calendar year by the number of days in the calendar year) does not exceed 75,000 barrels." 42 U.S.C. § 7545(*o*)(1)(K).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

Further, "[t]he Administrator shall act on any petition . . . not later than 90 days after the date of receipt." *Id.* § 7545(*o*)(9)(B)(iii).

## B. *Procedural History*

This matter involves the last of the three small refinery exceptions enumerated in the CAA. Petitioners challenge two EPA actions—each of which adjudicated and denied multiple exemption petitions ("Denial Actions"): *The first* is EPA's April 7, 2022, action "denying 36 petitions from 36 small refineries seeking exemption from their [RFS] obligations for the 2018 compliance year" ("April Denial").[6] *The second* is EPA's June 8, 2022, action denying "denying 69 petitions from 33 small refinery petitioners seeking exemption from their [RFS] obligations for the 2016–2021 compliance years" ("June Denial").[7]

### 1. *The April Denial*

On April 7, 2022, EPA published the April Denial—that is, the agency's final adjudications rejecting a total of thirty-six small refinery exemption petitions for the 2018 compliance year. Among those were petitions submitted by Calumet, TSAR, Ergon, Placid, and Wynnewood.[8] EPA denied those petitions using its revised interpretation of the subparagraph (B) exemption provision and RIN-passthrough economic theory.

---

[6] EPA, EPA-420-R-22-005, April 2022 Denial of Petitions for RFS Small Refinery Exemptions, at 1 (2022); *see also* April 2022 Denial of Petitions for Small Refinery Exemptions Under the Renewable Fuel Standard Program, 87 Fed. Reg. 24,300 (April 25, 2022).

[7] EPA, EPA-420-R-22-011, June 2022 Denial of Petitions for RFS Small Refinery Exemptions, at 1 (2022); *see also* Notice of June 2022 Denial of Petitions for Small Refinery Exemptions Under the Renewable Fuel Standard Program, 87 Fed. Reg. 34,873 (June 8, 2022).

[8] Ergon-WV's 2018 exemption petition was not adjudicated in the April Denial.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

Notably, the April Denial was not the first time EPA had evaluated these thirty-six petitions. Indeed, thirty-one of them had been *granted* by EPA in 2019.[9] These August 2019 grants were subsequently ensnared in proceedings litigated in the D.C. Circuit unrelated to the dispute at hand. What is relevant, however, is that EPA moved for voluntary remand without vacatur to consider those petitions with regard to the Tenth Circuit's "alternate holdings" in *Renewable Fuels Ass'n v. EPA* ("*RFA*").[10] The D.C. Circuit granted EPA's motion on December 8, 2021.[11] Shortly thereafter, EPA provided notice of its intent to include those previously decided petitions in the April Denial action.[12]

### 2. The June Denial

EPA once again applied its new interpretation and approach in June 2022 when it denied sixty-nine exemption petitions for the 2016 through 2021 RFS compliance years. Among those were petitions from (1) Calumet for 2019 and 2020; (2) TSAR for 2019, 2020, and 2021; (3) Ergon for 2019 and 2020; (4) Ergon-WV for 2019 and 2020; (5) Placid for 2019 and 2020; and (6) Wynnewood for 2017, 2019, 2020, and 2021.

EPA's new interpretation and approach—which it applied in the Denial Actions—displaced the adjudicative methodology the agency had

---

[9] Memorandum Decision on 2018 Small Refinery Exemption Petitions from Anne Idsal, Acting Asst. Admin'r, Off. of Air and Rad. to Sarah Dunham, Dir., Off. of Transp. and Air Qual. (Aug. 9, 2019), at 2.

[10] 948 F.3d 1206 (10th Cir. 2020), *rev'd on other grounds sub nom. HollyFrontier Cheyenne Ref., LLC v. RFA*, 141 S. Ct. 2172 (2021) ("*HollyFrontier*") and *vacated*, No. 18-9533, 2021 WL 8269239 (10th Cir. July 27, 2021).

[11] *RFA v. EPA*, No. 19-1220, Doc. 1925942, at 3 (D.C. Cir. Dec. 12, 2021).

[12] EPA, EPA-HQ-OAR-2021-0566, Scope of Action and Notifications (2022).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

relied on for over a decade. In that prior approach, EPA granted and denied petitions based on DOE's findings through its application of the DOE scoring matrix. That scoring matrix—developed as part of the statutorily-mandated 2011 DOE study—"was designed to evaluate the full impact of disproportionate economic hardship on small refiners and used to assess the individual degree of potential impairment."[13] But, starting with the April Denial, EPA has now completely abandoned the scoring matrix.

Instead, EPA now adjudicates petitions using an approach it announced in a December 2021 publication.[14] That approach rests on two components.

*First* is a revised interpretation of the statutory term "disproportionate economic hardship" as used in 42 U.S.C. § 7545(*o*)(9)(A)–(B). Under the agency's new interpretation, a small refinery's disproportionate economic hardship must be caused solely by RFS compliance costs.[15]

*Second* is a new economic theory. Called "RIN passthrough," EPA now theorizes that (A) the "cost of RINs is the same for all obligated parties, whether the RINs are acquired by blending renewable fuel or by buying them on the market" and (B) the "costs of RFS compliance (i.e., RINs) are passed through in the prices of refined products."[16]

Before us now are petitions for review of EPA's Denial Actions. Peti-

---

[13] Off. of Pol'y & Int'l Affs., U.S. Dep't of Energy, Small Refinery Exemption Study: An Investigation into Disproportionate Economic Hardship (2011), at 32 ("2011 DOE Study").

[14] *See* Notice of Opportunity to Comment on Proposed Denial of Petitions for Small Refinery Exemptions, 86 Fed. Reg. 70,999 (Dec. 14, 2021).

[15] *See* EPA, EPA-420-D-21-001, Proposed RFS Small Refinery Exemption Decision, at 23–26 (Dec. 2021) ("Proposed Denial").

[16] *Id.* at 62.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

tioners contend the Denial Actions are impermissibly retroactive, contrary to law, and arbitrary and capricious. For the reasons that follow, we agree. Accordingly, we vacate and remand petitioners' exemption petitions adjudicated in the Denial Actions.

## II.

Before we proceed to the merits of petitioners' contentions, we must address EPA's motion to transfer venue to the D.C. Circuit under 42 U.S.C. § 7607(b)(1).[17]

The CAA includes a statutory channeling provision delineating the appropriate venue in which a petitioner may seek judicial review of agency action:

> A petition for review of . . . any . . . nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action . . . under this chapter . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.

42 U.S.C. § 7607(b)(1).

Determining where proper venue lies under § 7607(b)(1) requires us

---

[17] *See* Order, No. 22-60266 (5th Cir. Oct. 21, 2022) (motions panel ordering the threshold issue of venue to carry with the merits).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

to conduct a two-step analysis:  At the first step, we determine whether the challenged agency action is "nationally applicable" as distinguished from "locally or regionally applicable."  *Id.*  If nationally applicable, our inquiry ends because proper venue exists only in the D.C. Circuit.  But if the challenged action is "locally or regionally applicable," we proceed to step two.

That second step begins with the default presumption that venue is proper in this circuit.  *See Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) ("*Texas 2016*").  To overcome that default presumption, a challenged action must satisfy two necessary and independent sub-conditions.  Namely, we must determine that (a) the challenged action "is based on a determination of nationwide scope or effect" and (b) the Administrator, in taking that challenged action, "finds and publishes that such action is based on such a determination."  Only if both sub-conditions are satisfied is venue proper solely in the D.C. Circuit.

*A.  Step One*

EPA first avers the Denial Actions are "nationally applicable" agency actions because they "apply a consistent statutory interpretation and economic analysis to small refineries nationwide."  The agency analogizes the Denial Actions to the SIP Calls in *Texas v. EPA*, where this court reasoned that the agency's disapproval of and call to correct thirteen states' plans regarding air quality standards was a "nationally applicable regulation."  No. 10-60961, 2011 WL 710598, at *3 (5th Cir. Feb. 24, 2011) ("*Texas 2011*").  The agency contends the Denial Actions, like the SIP Calls, rest on "a revised interpretation of the relevant CAA provisions and the RIN discount and RIN cost passthrough principles that are applicable to all small refineries no matter the location or market in which they operate."

We disagree with EPA's position.  In-circuit precedent counsels that it is the *legal* effect—and not the practical effect—of an agency action that

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

determines whether that action is "nationally applicable." *See Texas 2016*, 829 F.3d at 419. That is the key distinction between the SIP Call in *Texas 2011* and the Denial Actions in this case. The SIP Call in *Texas 2011* was sufficient—by itself—to change regulated entities' legal obligations. It required *all* states to apply their "prevention-of-significant-deterioration" programs to "greenhouse-gas-emitting sources." 2011 WL 710598, at *1–2. States whose plans already met that requirement were just as bound as states with violative plans. *See id.* at *4–5.

Not so with the "new approach" EPA used in the Denial Actions. EPA may swear that the new approach will apply in all future exemption petitions. But it cannot be said that EPA's promise to apply its "new approach"—as described in the Denial Actions—affects the legal rights, duties, or obligations of any small refinery whose exemption petitions were not the subject of the April Denial or June Denial. The agency's promise is naked—neither the new interpretation nor the RIN pass through theory binds EPA in *any* future adjudication.[18]

The Denial Actions are not "nationally applicable." They are, instead, "locally or regionally applicable." We must therefore proceed to the second step.

## B. *Step Two*

We begin step two with the presumption that venue is proper in this circuit. That's because we have already determined, at step one, that the agency action is "locally or regionally applicable." *See Texas 2016*, 829 F.3d at 419. A challenged action overcomes that presumption if (1) it is based on a determination of nationwide scope or effect, and (2) the Administrator, in

---

[18] EPA unsuccessfully asserts that its new interpretation and theory are imbued with the force of law and therefore binding on the agency. *See infra* part V.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

taking such action, "finds and publishes that such action is based on such a determination." 42 U.S.C. § 7607(b)(1). EPA claims the Denial Actions meet both sub-conditions.

We begin with the second sub-condition—whether the Administrator found and published that such an action was based on a determination of nationwide scope or effect. That is easily met, as no party contests that the Administrator so found and published in each of the Denial Actions.[19]

What the parties dispute is the *accuracy* of the Administrator's finding. And that is addressed in the first sub-condition.

The parties initially skirmish on the applicable standard of review for the first sub-condition. EPA asserts that we review its determination under a deferential standard, but petitioners contend that we owe no deference at all. Petitioners are correct. As explained in *Texas 2016*, we "independent[ly] assess[]" whether the action is based on a determination of nationwide scope or effect. 829 F.3d at 420 (citation omitted).

The agency's assertion to the contrary finds little support: All EPA cites to buttress its position is a nineteen-year-old, non-precedential decision in which the D.C. Circuit rejected a motion to transfer after it noted that "the Administrator has unambiguously determined that the final action . . . has nationwide scope and effect." *Alcoa, Inc. v. EPA*, No. 04-1189, 2004 WL 2713116, at *1 (D.C. Cir. Nov. 24, 2004). That is not enough, especially given that that same assertion was subsequently dismissed in *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875 (D.C. Cir. 2015). There, the D.C. Circuit characterized

---

[19] *See* 87 Fed. Reg. at 24,301 ("the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is hereby publishing that finding in the Federal Register."); *id.* at 34,874 (same).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

EPA's assertion "that venue in this circuit is 'compelled by [its] published determination that an action would have a nationwide scope or effect'" as nothing more than a "transparent sleight of hand that does not persuade." *Id.* at 881 (citation omitted). Consequently, we do not accord deference to EPA's determination.

EPA contends, in its motions-stage briefing, that the Denial Actions were based on a determination of nationwide scope or applicability" because it made "no unique or individualized findings as to the ability of any of the thirty-six petitioning refineries to recover the costs of RFS compliance" and "did not adjust its statutory interpretation and economic theory to the particulars of any specific small refinery, or the region in which a refinery operates." We disagree. EPA's motions-stage characterization of the Denial Actions is flatly contradicted by the agency's position on the merits and the explanations it provided in the Denial Actions:

*First*, when asked to defend the Denial Actions on the merits, EPA contends that it "considered each petition on the merits . . . and individual refinery information." That mirrors the Denial Actions that state that EPA

> completed a thorough evaluation of the data and information provided in the SRE petitions, supplemental submissions, and comments to determine if any of the petitioners have demonstrated that the cost of compliance with the RFS is the cause of their alleged DEH and that such costs are not passed through by that small refinery to the wholesale purchasers under the RIN cost passthrough principle.[20]

> *Second*, EPA admits that, even under its new approach, there is still a

---

[20] EPA, EPA-420-R-22-005, April 2022 Denial of Petitions for RFS Small Refinery Exemptions (2022), at 23; EPA, EPA-420-R-22-011, June 2022 Denial of Petitions for RFS Small Refinery Exemptions (2022), at 24.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

non-zero chance it will grant small refinery petitions. According to the agency's briefing, EPA will grant exemption petitions to small refineries that provide data and evidence demonstrating that they faced disproportionate economic hardship contrary to the facts regarding other small refineries.

EPA's representations in the Denial Actions and its position on the merits show that its new interpretation and RIN passthrough theory—without more—fail to provide the agency with a sufficient basis to adjudicate exemption petitions. When EPA says it denied petitions "based on factors and facts common to each petition," it also implicitly concedes that there were no refinery-specific facts that would justify the issuance of an exemption. The agency thus had to verify that each of the petitions implicated in the Denial Actions did not (1) present facts contrary to those of other non-exempt small refineries and (2) demonstrate disproportionate economic hardship consistent with the statutory criteria.[21] Consequently, the Denial Actions rely on refinery-specific determinations and are not based on a determination of nationwide scope or effect.

Because the Denial Actions are neither nationally applicable nor based on a determination of nationwide scope or effect, venue is proper in the Fifth Circuit. EPA's motion to transfer venue to the D.C. Circuit is denied. We turn to the merits.

## III.

The Administrative Procedure Act ("APA") requires us to "set aside" agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary-and-capricious review requires this court to scrutinize the record to determine whether the agency has "examine[d] the relevant data and artic-

---

[21] *See id.*

ulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). We "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Id.* (quoting *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 196 (1947)). Instead, "we must set aside" agency action that is "premised on reasoning that that fails to account for relevant factors or evinces a clear error of judgment" as arbitrary and capricious. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (cleaned up).

Petitioners contend the Denial Actions are defective in three ways: *First*, they are impermissibly retroactive. *Second*, EPA's interpretation of the CAA is contrary to law. *And third*, the agency acted arbitrarily and capriciously by failing to engage in reasoned decision-making.

### A. Retroactivity

The 2011 DOE Study and the scoring matrix are the two factors EPA relied on for over a decade when deciding whether to grant subparagraph (B) exemption petitions. But starting with the April Denial, EPA threw those factors away: Now, the 2011 DOE Study and the scoring matrix have no bearing on the agency's decision-making process.

Petitioners cry foul—explaining that they had relied on those two factors when they submitted the exemption petitions implicated in the Denial Actions. EPA says petitioners have nothing to complain about. According to the agency, petitioners (1) have no protectable property right in subparagraph (B) exemptions and (2) should not have relied on the approach used in the agency's prior adjudications. We disagree with EPA on both points.

Petitioners have a protectable property interest because the small-refinery exemption is "an entitlement expressly created by statute," *McDon-*

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

*ald v. Watt*, 653 F.2d 1035, 1045–46 (5th Cir. Unit A Aug. 1981), which EPA "shall" grant for any small refinery that shows "disproportionate economic hardship," 42 U.S.C. § 7545(*o*)(9)(B)(ii). The CAA defines the factors EPA must consider in deciding whether to grant or deny an exemption, and, once those factors have been satisfied, the agency is legally obligated to grant such a petition. *See id.*

Because petitioners possess a protectable property interest, we must determine whether the regulation is impermissibly retroactive. There is no blanket prohibition against retroactive application of regulation through adjudication.[22] But that power—to regulate retroactively—is limited to circumstances in which retroactive application would not result in "injury or prejudice." *Handley*, 587 F.3d at 283 (quoting *Pac. Molasses Co. v. FTC*, 356 F.2d 386, 390 n.10 (5th Cir. 1966)).

Thus, we must "balance the ills of retroactivity against the disadvantages of prospectivity." *Microcomputer Tech. Inst. v. Riley*, 139 F.3d 1044, 1050 (5th Cir. 1998).[23] And in conducting such balancing, we accord no deference to the agency's determination that its approach should be applied retroactively, for that determination does not involve policy considerations delegated to the agency or require any agency expertise. *Id.* at 1050–51. "If that mischief [of prospectivity] is greater than the ill effect of the retroactive

---

[22] *See Chenery II*, 332 U.S. at 203–04; *Macy's, Inc. v. NLRB*, 824 F.3d 557, 566–67 (5th Cir. 2016); *Handley v. Chapman*, 587 F.3d 273, 283 (5th Cir. 2009) (Regulation is retroactive where its application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." (quoting *Fernandez–Vargas v. Gonzales*, 548 U.S. 30, 37 (2006))).

[23] Balancing occurs "case-by-case," and this court has previously rejected the multi-factor balancing tests adopted by other circuits, *see id.* (rejecting D.C. Circuit's five-factor test).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

application of a new standard, it is not the type of retroactivity which is condemned by law." *Monteon-Camargo v. Barr*, 918 F.3d 423, 430 (5th Cir. 2019), *as revised* (Apr. 26, 2019) (quoting *Chenery II*, 332 U.S. at 203). Typically, "the ill effect of retroactivity is the frustration of the expectations of those who have justifiably relied on a prior rule; the ill effect of prospectivity is the partial frustration of the statutory purpose which the agency has perceived to be advanced by the new rule." *McDonald*, 653 F.2d at 1044.

We start the balancing analysis with the ills of retroactivity. Petitioners justifiably relied on EPA's past agency practice when applying for the exemptions at issue. EPA—for over a decade—consistently used the 2011 DOE Study and scoring matrix to adjudicate small-refinery exemption petitions. That is exactly the kind of "well established" agency practice that forms the basis for justifiable reliance. *Id.* at 1045 (citation omitted).[24] EPA "cannot 'surprise' [petitioners] by penalizing [them] for 'good-faith reliance' on the agency's prior positions." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156–57 (2012)).

EPA nonetheless maintains that petitioners' reliance was unjustifiable because they were—or should have been—aware of impending changes to agency policy. The EPA first points to its publication requesting comment on its proposed interpretation and theory. But that request for comment was not published in the Federal Register until December 2021.[25] The April

---

[24] EPA insists petitioners couldn't have justifiably relied on its prior approach because it wasn't "announced in an interpretive rule" or "subjected . . . to notice and comment." The agency's position is cute but wrong. Longstanding and well-established agency practice need not be officially adopted to form the basis for reasonable reliance. *See id.*

[25] *See* 86 Fed. Reg. at 70,999–71,000.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

Denial adjudicated exemption petitions submitted in 2018.[26] And all of petitioners' exemption petitions that were adjudicated in the June Denial had been submitted before December 2021.[27] Thus, all petitioners' exemptions were submitted before EPA provided notice in the Federal Register that it intended to change its adjudicative methodology.[28] EPA's December 2021 notice and comment publication does not render petitioners' reliance unjustifiable.

Next, EPA asserts that petitioners' reliance was unjustifiable by June 2021—the month litigation ended in *RFA*.[29] We disagree with EPA's assertion that *RFA* provided petitioners with notice by June 2021.[30]

For one, EPA's expressly states its policy is only to "provide for exceptions to the general policy" in response to "decisions of the federal courts that arise from challenges to 'locally or regionally applicable' actions . . . ." 40 C.F.R. § 56.3(d). A Tenth Circuit decision—no matter its holding—had no effect on petitioners' operating outside that circuit's boundaries.

Moreover, the initial Tenth Circuit panel opinion—which held that

---

[26] The April Denial included 2018 compliance-year petitions from Calumet, TSAR, Ergon, Placid, and Wynnewood.

[27] The June Denial included Calumet, TSAR, Ergon, Ergon-WV, and Placid's 2019 and 2020 petitions; TSAR's 2019, 2020, and 2021 petitions; and Wynnewood's 2017, 2019, 2020, and 2021 petitions. TSAR's 2021 petition was submitted on November 23, 2021, and Wynnewood's 2021 petition was submitted on September 23, 2021.

[28] Petitioners, unlike Ant-Man and the Wasp, cannot time travel. *See also Rick and Morty: The Vat of Acid Episode* (Comedy Central May 17, 2020).

[29] *See supra* note 10 and accompanying text.

[30] Even if we assume *arguendo* that petitioners had notice by June 2021, that would affect only TSAR's and Wynnewood's 2021 petitions; the other seventeen petitions in this case were filed before June 2021.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

EPA's prior approach of finding disproportionate economic hardship allowed the agency to act "outside the scope of [its] statutory authority" when "[g]ranting extensions of exemptions based in part on hardships not caused by RFS compliance"[31]—was *vacated* by a subsequent Tenth Circuit panel.[32]  That, in turn, "remove[s] both the *res judicata* and the *stare decisis* effect" from the initial *RFA* panel opinion.  *City Ctr. W., LP v. Am. Mod. Home Ins. Co.*, 749 F.3d 912, 913–14 (10th Cir. 2014).

Thus, it is EPA that is being unreasonable when it blames petitioners for disregarding a vacated holding that—per EPA's own regulations—never had any effect outside the Tenth Circuit.  Consequently, petitioners' continued reliance on EPA's longstanding and well-established practice of adjudicating exemption petitions based on the 2011 DOE study and scoring matrix was justifiable till the agency first published notice of its intent to change its adjudicative methodology in December 2021.[33]

---

[31] *RFA*, 948 F.3d at 1254.

[32] *Renewable Fuels Ass'n v. EPA*, 854 F. App'x 983, 984 (10th Cir. 2021) (per curiam) ("*RFA II*") ("In light of the United States Supreme Court's decision in *HollyFrontier* . . . we previously recalled our mandate and vacated our judgment in this case.").

[33] In its brief, EPA asserts it "indicat[ed] that it would follow" the *RFA* holding on the agency's approach of finding disproportionate economic hardship "on remand if the Tenth Circuit denied the motion or did not clarify otherwise."  *See* EPA's Motion for Clarification of the Court's July 29, 2021 Mandate, *RFA II*, No. 18-9533, Doc. 010110564301, at 6–7 (Aug. 19, 2021) ("*RFA II* Motion").

For three reasons, that does not change our analysis: *First*, EPA's intent, as stated in its *RFA II* motion, was limited to the three exemption petitions in *RFA*.  The only petition in this case that overlaps with *RFA* is Wynnewood's 2017 exemption petition.  *Second*, EPA stated in its Tenth Circuit motion that it *had not decided* "what, if any, impact . . . the unaffected holdings . . . may have on EPA's implementation of the RFS program."  *Id.* at 6; *cf. FTC v. Standard Oil Co.*, 449 U.S. 232, 240 (1980) (agency's "threshold determination that further inquiry is warranted . . . is not 'definitive'" agency action).  *Third*, it is hardly reasonable to ask regulated entities to rely on EPA's statements of future intent made in the course of litigation.  *Cf. BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 911 & n.4 (5th

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

We now turn to the other side of the balancing equation and analyze the disadvantages of prospectivity. *See Microcomputer Tech. Inst.*, 139 F.3d at 1050. In other words, we must determine what benefits are lost if EPA's new interpretation and RIN passthrough theory are applied only to newly submitted exemption petitions.

EPA fails to identify a single benefit of retroactive application. Intervenors assert retroactive application is necessary because "withholding the Denials' effect would harm the producers of renewable fuel" and "depress the demand for renewable fuel." That is absurd. The exemption petitions in this case concern compliance years 2017 to 2021. By the time EPA published the Denial Actions, no producer could have produced RINs applicable to these petitions, *see* 40 C.F.R. §§ 80.1427(a)(6), 80.1428(c), 80.1431(a), so the Denial Actions could not have affected the amount of renewable fuel blended in those past years.

The result of the balancing test could not be more obvious: There is no legitimate benefit EPA can gain from retroactive application. On the other hand, retroactive application of EPA's new adjudicative methodology harshly penalizes petitioners for their good-faith and justified reliance on the agency's prior approach.[34] EPA impermissibly applied its new CAA interpretation and RIN passthrough theory to petitioners' years-old exemption petitions.

### B. *Contrary to Law*

Petitioners contend the Denial Actions are contrary to law for four

---

Cir. 2023) (discounting post-hoc agency rationalizations).

[34] *See R.J. Reynolds*, 65 F.4th at 189 ("Dealing with administrative agencies is all too often a complicated and expensive game, and players . . . 'are entitled to know the rules.'" (citation omitted)).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

reasons.

### 1. *Disproportionate Economic Hardship*

Under EPA's new interpretation, RFS compliance costs must be *the sole cause* of a small refinery's disproportionate economic hardship. In other words, a small refinery will receive an exemption only if it can show that it has incurred disproportionate RFS compliance costs. Petitioners insist that that is an unreasonable construction of the statute. We agree.

The CAA provides small refineries with the ability to submit a petition requesting an exemption from RFS "for the reason of disproportionate economic hardship." 42 U.S.C. § 7545(*o*)(9)(B)(i). An exemption petition, once submitted, is evaluated by the Administrator "in consultation with the Secretary of Energy." § 7545(*o*)(9)(B)(ii). In that evaluation, "the Administrator . . . shall consider the findings of the study under subparagraph (A)(ii)" — that is, the 2011 DOE Study — "and other economic factors." *Id.*

At dispute is what qualifies as "disproportionate economic hardship" for a subparagraph (B) exemption. *See id.* at § 7545(*o*)(9)(B)(i). Subparagraph (A) uses that same phrase twice.[35] But neither subparagraph defines it.

EPA theorizes that disproportionate economic hardship can only mean RFS compliance costs. It bases that conclusion on its observation that the phrase, as used in subparagraph (A), does not identify any cause of dis-

---

[35] *First*, in subparagraph (*o*)(9)(A)(ii)(I), the Secretary of Energy is instructed to "determine whether compliance with [RFS] would impose a disproportionate economic harm on small refineries," the product of which is the 2011 DOE Study. *Second*, in subparagraph (II), which directs the Administrator to extend the initial subparagraph (A)(i) exemption — the blanket exemption for all small refineries "until calendar year 2011" — for any small refinery that "would be subject to a disproportionate economic hardship if required to comply with [RFS] . . . ."

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

proportionate economic hardship other than RFS compliance costs.[36] It thus posits that the statute should be read to say that RFS compliance costs are the sole cause of disproportionate economic hardship.[37]

Petitioners disagree: They instead contend that "disproportionate economic hardship" should be interpreted more broadly. In their view, a small refinery can experience disproportionate economic hardship for myriad causes; it qualifies for the exemption if RFS compliance cost is one such cause.

We agree with petitioners. EPA's interpretation is foreclosed by the statute's text in two ways:

*First*, to interpret "disproportionate economic hardship" as synony-

---

[36] The reasoning employed here is suspect as well. EPA interprets two phrases in subparagraph (A)—namely, "would impose" and "subject to . . . if required to comply"—as creating an *exclusive* causal relationship between RFS compliance costs and disproportionate economic hardship. *See* § 7545(*o*)(9)(A)(ii). That is error because neither provision purports to rule out other causes of disproportionate economic harm.

[37] EPA asks us to defer to its interpretation under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). EPA claims *Chevron* applies because it "undertook notice and comment before taking the Denial Actions."

Not so fast. While the agency did subject its interpretation to notice-and-comment proceedings, it applied that interpretation in *informal* adjudication, not notice-and-comment rulemaking or formal adjudication. *See United States v. Mead Corp.*, 533 U.S. 218, 230 (2001). True, EPA's decision to engage in informal adjudication "does not automatically deprive that interpretation of the judicial deference otherwise its due." *Texas v. United States*, 809 F.3d 134, 178 n.160 (5th Cir. 2015) (quoting *Barnhart v. Walton*, 535 U.S. 212, 221 (2002)), *aff'd by an equally divided court*, 579 U.S. 547 (2016). But to qualify for *Chevron* deference, EPA's interpretation must satisfy the *Barnhart* test, which asks us to consider factors such as "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time . . . ." 535 U.S. at 222. We need not decide whether the *Barnhart* test is satisfied because EPA's interpretation fails even under *Chevron*. *See infra* note 43.

mous with "RFS compliance cost" would render part of subparagraph (B)(ii) a nullity. That provision stipulates that the Administrator, in evaluating subparagraph (B) exemption petitions, shall consider (1) the 2011 DOE study and (2) "other economic factors." § 7545(*o*)(9)(B)(ii). EPA's interpretation of "disproportionate economic hardship" leaves no room for "other economic factors"—it makes the first factor outcome-determinative for every exemption petition. But those words "cannot be meaningless, else they would not have been used."[38] Thus, subparagraph (B)(ii) contemplates granting exemptions to small refineries that experience disproportionate economic hardship attributable to a combination of (1) RFS compliance costs and (2) economic factors other than RFS compliance costs.

*Second*, EPA's approach to defining "disproportionate economic hardship" is misguided. The agency relies heavily on subparagraph (A) to define the phrase. It justifies its approach on the absence of a definition in subparagraph (B). EPA's justification is incorrect. Though it is true that we presume—absent persuasive countervailing evidence—that identical words and phrases "bear the same meaning throughout a text,"[39] subparagraph (A) does not define "disproportionate economic hardship" either. And "[w]here Congress does not furnish a definition of its own, we generally seek to afford a statutory term 'its ordinary or natural meaning.'" *HollyFrontier*, 141 S. Ct. at 2176 (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)).

"Disproportionate economic hardship," as ordinarily understood, includes much more than just RFS compliance cost. "Disproportionate" modifies "economic hardship." For economic harm to be disproportionate,

---

[38] Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (quoting *United States v. Butler*, 297 U.S. 1, 65 (1936)).

[39] *Id.* at 170.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

it must be "inadequately or excessively proportioned."[40]  The relevant comparator—that to which the harm is "proportioned"—could be the amount other small refineries pay to comply with RFS.  But it could also be factors unrelated to RFS, such as local economic conditions or refinery-specific circumstances.  For example, "small refineries might apply for exemptions . . . in light of market fluctuations and changing hardship conditions."  *Holly-Frontier*, 141 S. Ct. at 2178.  Congress could have—but did not—enumerate the particular ways in which economic harm might be "disproportionate."[41]  We therefore accord the phrase disproportionate economic harm its "full and fair scope," for "the presumed point of using general words is to produce general coverage."[42]

EPA's interpretation 42 U.S.C. § 7545(*o*)(9)(B) is unreasonable.[43]  The statute's text cannot plausibly be read to say that RFS compliance costs must be the sole cause of disproportionate economic hardship.

---

[40] *Disproportionate*, Oxford English Dictionary, tinyurl.com/32spx2ve.

[41] *See, e.g.*, 26 U.S.C. § 302(b)(2)(C) (delineating in detail when a "distribution is substantially disproportionate").

[42] Scalia & Garner, *supra* note 38, at 101.

[43] *Chevron* deference applies "only if 'the agency's [interpretation] is based on a permissible construction of the statute.'"  *Huntington Ingalls, Inc. v. Dir., Off. Of Workers' Comp. Programs, U.S. Dep't of Lab.*, 70 F.4th 245, 252 (5th Cir. 2023) (quoting *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 963 (5th Cir. 2023)).  EPA's interpretation falls outside "the range of meanings that could be plausibly attributed to the relevant statutory language."  *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1024 (5th Cir. 2019) (citation omitted).  Consequently, EPA's interpretation is not entitled to *Chevron* deference.

Furthermore, EPA is not entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1994), because an unreasonable interpretation of a statute's text cannot be persuasive.  *See Texas*, 809 F.3d at 178 n.160 (citing *Gonzales v. Oregon*, 546 U.S. 243, 256 (2006)).

*2. Petitioners' other reasons that the Denial Actions are contrary to law.*

Petitioners urge that the Denial Actions are contrary to law for three other reasons. On those claims, we agree with EPA.

*First*, petitioners assert the EPA's interpretation is unlawful because it was adopted on the agency's mistaken belief that it was bound by the alternate holdings in *RFA*—a now-vacated Tenth Circuit case interpreting the relevant statutory provisions. *See RFA II*, 854 F. App'x at 984. But the agency record shows that the EPA adopted *RFA*'s reasoning because it "determined that the *RFA* decision provides the best reading of the statutory provisions of CAA section 211(*o*)(9)." That is an independent basis for EPA's interpretation, *i.e.*, the agency did not base its interpretation on the idea it was bound by *RFA*'s alternate holdings. Thus, EPA's interpretation did not violate the *Chenery* mistake-of-law doctrine. *Cf. Teva Pharm. U.S.A. Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006).

*Second*, petitioners allege EPA impermissibly construed the statute's requirement that it consult with DOE in deciding an exemption petition. In their view, EPA's consultation with DOE had to be "meaningful," which requires EPA and DOE to—at a minimum—consult on "whether EPA's new RIN pass-through theory was actually correct and applicable to each small refinery." Petitioners claim EPA fell short of that standard with the Denial Actions because EPA merely asked DOE to "assume the RIN pass-through theory was correct and an appropriate basis for denying the hardship petitions." EPA counters by claiming that it, along with DOE, has "discretion to determine the shape of the procedural consultation requirement."

We agree with EPA. Congress did not define the term "consultation" as used in the relevant statutory provision. *See* 42 U.S.C. § 7545(*o*)(9)(B)(ii). It only stipulates the subjects the agencies must cover. We decline to graft extra-textual procedural requirements onto that consultation requirement.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

*See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 525 (1978).

*Third*, petitioners attest the Denial Actions are contrary to law because EPA evaluated multiple petitions simultaneously. Pointing to § 7545(*o*)(9)(B)'s use of the terms "a small refinery" and "a petition," petitioners claim that the petitions must be examined one at a time. True, using "a"—an indefinite article immediately followed with a singular noun— can refer to "one" of something. But it can also indicate "that there may be two or more substantial parts." *Comm'r v. Kelley*, 293 F.2d 904, 912 (5th Cir. 1961). Without more, petitioners fail to show that the relevant statutory provisions require EPA to consider exemption petitions individually. We are textualists, not literalists.

We conclude the Denial Actions are contrary to law only because EPA's interpretation of the CAA subparagraph (B) exemption provision is unreasonable. Petitioners' other claims fail.

## C. Arbitrary and Capricious

Petitioners contend the Denial Actions are arbitrary and capricious because they rely on the RIN-passthrough theory, which ran counter to the evidence before the EPA.

The APA requires us to "set aside agency action if the agency . . . 'offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co.*, 920 F.3d at 1013 (quoting *State Farm*, 463 U.S. at 43) (cleaned up). That includes agency action that is "premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr.*, 985 F.3d at 475 (internal quotation marks and citation omitted).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

Petitioners take issue with EPA's RIN-passthrough economic theory—that is, the agency's conclusion that the "market-based design of the RFS program and the RIN-based compliance system have equalized the cost of compliance among all market participants." EPA made two findings to support its RIN-passthrough theory: *The first* is that the price per RIN at any given point in time is identical for all refineries nationwide. *The second* is that market prices for fuel and RIN costs correspond, which means all refineries could offset 100% of their RIN costs by raising the price of their fuel products, thereby passing RIN costs along to their customers. Petitioners claim those two findings are contrary to the evidence before EPA.

We agree that EPA's RIN-passthrough theory is contrary to the evidence. EPA's second finding—that all refineries can completely pass on their RIN costs—is so implausible as applied to petitioners that it cannot be ascribed to a difference in view or agency expertise. *See Sw. Elec. Power Co.*, 920 F.3d at 1013 (quoting *State Farm*, 463 U.S. at 43).

Petitioners have demonstrated that the local markets in which they operate are inefficient. Calumet's exemption petition, for example, included market price data from the local "micro-market" it operated in as compared to Pasadena, Texas. Pasadena is an example of an economically efficient market—that is, a market in which EPA's general conclusion about RIN passthrough holds true—so the price premium for fuel there matches the market price of RINs. Not so with Calumet's micro-market: Prices there are lower than in Pasadena, which means that fuel is discounted by more than the corresponding RIN market price.

EPA does not seriously engage with petitioners' refinery-specific market data. The agency's two responses are insufficient:

*First*, EPA's conclusions about fuel market efficiency in general do not disprove petitioners' local market data. The agency arrived at that conclu-

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

sion by "examin[ing] available market data, as well as studies by outside par-ties and numerous public comments."[44] That allowed the agency to con-clude that "the RIN costs and RIN discount were fully passed through to wholesale purchasers and reflected in the market prices of petroleum fuel and blended fuel . . . ."[45] But EPA's macro-level analysis about fuel markets only supports a conclusion that passthrough can occur in fuel markets generally—it does not rule out the existence of inefficient fuel markets. And those are the markets in which petitioners operate.

*Second*, EPA glosses over petitioners' refinery-specific data proving they operate in inefficient local markets that do not allow for RIN cost pass-through. In response to Calumet's data, for example, all EPA said was that the Pasadena market demonstrated "the RIN price is fully passed through."

---

[44] EPA, EPA-420-R-22-011, June 2022 Denial of Petitions for RFS Small Refinery Exemptions (2022), at 32. Petitioners' attempts to challenge EPA's conclusions about these studies are not meritorious. EPA concluded that these studies "on balance . . . pro-vide more evidence in support of the conclusion that RIN costs are passed through than evidence to suggest they do not." Petitioners interpret those studies differently from how EPA does. But that's not enough for us to conclude that EPA's conclusion is counter to the evidence. EPA provided a reasonable explanation as to why it questioned the studies petitioners identified when the agency pointed to potential methodological infirmities in each. Petitioners' reply briefing does not explain why EPA's critiques are irrelevant or incorrect. It cannot be said that petitioners' studies made it unreasonable for EPA to reach a conclusion opposite to that held by petitioners.

Additionally, petitioners cite a GAO report that is not in the administrative record, U.S. Gov't Accountability Off., GAO-23-104273, Renewable Fuel Standard: Actions Needed to Improve Decision-Making in the Small Refinery Exemption Program (2022). Generally, we do not review information that was outside the record when the agency made its decision. *See Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012). Even though the GAO report is based on evidence available at the time the agency made its deci-sion, petitioners cannot—and do not—contend that its conclusions and findings are based *solely* on data in the record. We therefore exclude the GAO report from our analysis.

[45] EPA, EPA-420-R-22-011, June 2022 Denial of Petitions for RFS Small Refinery Exemptions (2022), at 32.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

That's not responsive—both petitioners and EPA agree Pasadena is efficient. The problem is that Calumet does not operate in Pasadena. EPA leaves unrebutted petitioners' actual contention—that lower sale prices in the micro-market relative to the efficient Pasadena market prove that Calumet, like other petitioners, cannot pass through the costs of the RINs it purchases.

EPA's second finding is also contrary to the evidence because petitioners are unable to purchase RINs ratably. Ratable purchasing is an underlying premise of EPA's second finding—a refinery must be able to purchase RINs at the same time they sell fuel in order for the market price to correspond with the price of RINs. That's not an option available to petitioners. Take TSAR for example: Given the amount of fuel it produces, it would need to buy 75,000 RINs per day. But a trade size of 75,000 RINs is "essentially unheard of" in the RIN market—most RINs are sold in "a clip of '1 million' at a time." Indeed, as TSAR explained to the EPA, it can't even find a RIN broker willing to transact at such low RIN quantities.

EPA brushes that evidence aside. In response to TSAR, the agency merely restates its prior assertion that "small refineries can enter into contracts with various RIN brokers to purchase RINs on a ratable basis." The agency supports its assertion by dreaming up a hypothetical contract—filled with unsubstantiated speculation about terms such RIN clip sale prices and broker service fees—that TSAR might be able to negotiate. But EPA never explains why it believes small refineries can get contract terms like those. Unsubstantiated agency speculation does not overcome petitioners' proven inability to purchase market-rate RINs ratably.

IV.

Petitioners complain that EPA acted arbitrarily and capriciously by failing to provide sufficient guidance as to the information small refineries should submit as part of their exemption petitions under the agency's new

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

interpretation and RIN passthrough theory.

We disagree with petitioners. As a general matter, courts cannot compel agencies to act.[46] Petitioners do not allege that the CAA expressly requires EPA to issue such guidance. An agency's control over its timetables is entitled to considerable deference.[47] That EPA has yet to make good on its promise to provide further guidance does not render the agency's current (lack of) guidance arbitrary and capricious.

\* \* \* \* \*

In summary: The challenged Denial Actions are locally or regionally applicable. EPA's motion to transfer venue to the District of Columbia Circuit is DENIED.

The EPA's denials of petitioners' small refinery exemption petitions are impermissibly retroactive. Furthermore, the agency's interpretation of the small refinery exemption petition provisions of the CAA is contrary to law and arbitrary and capricious as applied to petitioners' exemptions. The petitions for review are GRANTED. The challenged adjudications are VACATED and REMANDED for further consideration.

---

[46] *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("'[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.'" (emphases omitted)).

[47] *See* Charles H. Koch, Jr. & Richard Murphy, 4 Admin. L. & Prac. § 11:50 (Westlaw).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

Patrick E. Higginbotham, *Circuit Judge*, dissenting:

Congress carefully crafted the Renewable Fuel Standard ("RFS") program of the Clean Air Act to nudge the nation toward clean renewable fuel sources[1] and Congress, in light of "the advantages of expeditious and authoritative review of all national standards in the D.C. Circuit," also implemented a judicial review venue provision that "priorities efficiency" in the form of 42 U.S.C. § 7607(b)(1).[2] Today we impermissibly interfere with these Congressional mandates by finding that venue is proper in this Circuit, contrary to the text, structure, and purpose of § 7607(b)(1). I would find that venue is only proper in the D.C. Circuit, consistent with the actions of the four other circuit courts that have addressed this very case, and dissent.

## I.

The majority correctly describes the overall mechanics of the CAA's venue provision.[3] At step one, we determine whether a final agency action is "nationally applicable," as distinguished from a "locally or regionally applicable" action. If "nationally applicable," venue is only proper in the D.C. Circuit.[4] If we find that the challenged action is "locally or regionally" applicable, we proceed to step two. At this second step, a "locally or regionally applicable" action must be reviewed in the D.C. Circuit if (1) it is "based on a determination of nationwide scope or effect" and (2) the Administrator "finds and publishes that such action is based on such a

---

[1] Pub. L. No. 110-140, 121 Stat. 1492.

[2] 41 Fed. Reg. 56767 (Dec. 30, 1976) (Comments of G. William Frick).

[3] *See generally* 42 U.S.C. § 7607(b)(1). "Had Congress wanted to prioritize efficiency, it could have authorized direct circuit-court review of all nationally applicable regulations, as it did under the Clean Air Act." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 130 (2018).

[4] 42 U.S.C. § 7607(b)(1).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

determination"[5] The majority opinion errs at both steps of the venue analysis, inappropriately finding that venue is proper in this Circuit.

## A.

According to the majority, "[i]n-circuit precedent" controls the outcome of the venue analysis at step one. As we are supposedly obliged to look to the "*legal* effect—and not the practical effect—of an agency action" to determine whether the action is "nationally applicable," the Denial Actions must be "locally or regionally applicable" because they do not "change regulated entities' legal obligations" for "*all* states." With due respect, this "legal effect" rule runs counter to the text, structure, and purpose of the CAA's venue provision.

As a starting matter, the majority's description of the "legal effect" rule as in-circuit *precedent* relies on *Texas 2016* to support its assertion. In *Texas* 2016, both "parties agree[d] that the [agency action] under review [was] a locally or regionally applicable action."[6] Whether the "legal" or "practical" effect of an agency action determines its scope was not before the Court.[7] As a result, the panel's statement in *Texas 2016* that "[t]he question of applicability turns on the legal impact as a whole" is dicta.

Issues with "precedent" aside, this quest reads words into the statute that are not there. Section 7607(b)(1) refers only to agency actions that are "nationally applicable." Nowhere does the text of the statute reference or suggest that Congress intended to distinguish between "legal" and

---

[5] *Id.*

[6] *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) ("*Texas 2016*").

[7] *Id.*

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

"practical" effects. Indeed, this part of the statute does not refer to "effects" at all. The question is one of "national applicability."

Not only does the majority read new words into the statute, but in fashioning its new "legal effect" theory, they elide *Texas 2016*'s reference to the plain meaning of the term "nationwide" and ignore *Texas 2011*, which also defines the key terms of the statute by reference to the words' plain meaning.[8] Instead, we should look to the plain meaning of "nationally" to understand what Congress set out to achieve with § 7607(b)(1). "Nationally" generally means "throughout the whole nation."[9] As commonly understood, a reasonable person would measure "nationally applicable" by looking to "the location of the persons or enterprises that the action regulates."[10] Applying this definition, the Denial Actions are here inescapably nationally applicable: they apply one consistent statutory interpretation and economic analysis to thirty-six small refineries, located in eighteen different states, in the geographical boundaries of eight different circuit courts. Without the siren song of the war against the administrative state, they are, for all intents and purposes, "applicable" across the "nation."

---

[8] *See Texas v. EPA.*, No. 10-60961, 2011 WL 710598, at *4 n.4 (5th Cir. Feb. 24, 2011) ("*Texas 2011*").

[9] *See Texas 2016*, 829 F.3d at 420 n. 22, defining "nationwide" as "throughout the whole nation." "National" means "of or relating to a nation." *Nation*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/national (last visited Nov. 19, 2023); "Nationally" means "in a national manner; as a nation; with regard to the nation as a whole." *Nationally*, Oxford English Dictionary, https://www.oed.com/dictionary/nationally_adv?tab=meaning_and_use#35387357 (last visited Nov. 19, 2023).

[10] *Texas 2011*, 2011 WL 710598, at *3 (citing *New York v. EPA*, 133 F.3d 987, 990 (7th Cir. 1998)). *See also* JOHN F. MANNING, WHAT DIVIDES TEXTUALISTS FROM PURPOSIVISTS?, 106 COLUM. L. REV. 70, 76 (2006).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

By applying the plain meaning of "nationally" along with this Court's precedents, venue is proper only in the D.C. Circuit. In *Texas 2011*, we found an agency action to be nationally applicable when it applied to only thirteen states and seven different circuit courts.[11] Here, we have eighteen states within eight different circuits, all facing the same new statutory interpretation and economic analysis. In *Texas 2020*, this Court found that the agency action in question was "locally or regionally" applicable because it only applied to four *counties* within the State of Texas,[12] and to *Sierra Club v. EPA*, in which we similarly found that the agency action was not "nationally applicable" because it dealt exclusively with a State Implementation Plan ("SIP") for the State of Louisiana.[13] Even *American Road &Transportation Builders Association v. EPA*, which *Texas 2016* cites favorably to fashion its "legal effects" pronouncement, dealt with the denial of a SIP exclusively applicable to the State of California.[14] *Texas 2020*, *Sierra Club*, and *American Road*, when compared to the facts of this case and when the term "nationally applicable" is given its common sense reading, require transfer of this case to its proper venue in the D.C. Circuit.

By the majority's reading of § 7607(b)(1), if the EPA denied the petitions of small refineries located in every single U.S. state and territory in one single agency action, this denial action would *still* not be "nationally applicable" because it does not have any binding "legal effect" on future hardship petitions. That result simply defies common sense.

---

[11] *Texas 2011*, 2011 WL 710598, at *3.

[12] *Texas v. EPA*, 983 F.3d 826, 833 (5th Cir. 2020) ("*Texas 2020*").

[13] *Sierra Club v. EPA*, 939 F.3d 649 (5th Cir. 2019).

[14] *Am. Road & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455–56 (D.C. Cir. 2013).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

The proffered new rule also "does violence . . . to the structure and language of the statute."[15] Section 7607(b)(1) refers to "final agency action," and the Administrative Procedure Act defines "agency action" to include both rulemakings *and* adjudications.[16] Section 7607(b)(1) then contemplates scenarios, such as this one, in which an agency may proceed through an "action," such as an adjudication, that is of "national applicability." But as adjudications lack "legal effect" beyond the parties involved, they could never be "nationally applicable" as defined by the majority. Thus, the majority's "legal effects" reading of the statute effectively removes *all* "adjudications" from the ambit of § 7607(b)(1), contrary to the plain text of the statute.

Additionally, this "legal effects" rule offers no meaningful guidance to litigants, particularly problematic when considering that venue provisions should "draw bright lines to minimize waste and expense of litigation over whether a case has been brought in the right court."[17] Its new rule begs the question: even if we were to require "legal effects," why do those effects have to be "future" legal effects? And why are "present" legal effects, which in this case, are felt over a large swath of the country, insufficient? The majority's now re-written § 7607(b)(1) then reads:

> [a] petition for review of . . . any . . . nationally applicable regulations [*with future legal effects*] promulgated, or final action taken [*minus adjudications*], by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia.

---

[15] *Smith v. United States*, 508 U.S. 223, 240 (1993).

[16] *See* 5 U.S.C. 551(13).

[17] 41 Fed. Reg. 56767 (Dec. 30, 1976) (Comments of G. William Frick).

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

Contrary to the majority's re-working of the statute, I would simply conduct the venue analysis by applying the plain meaning of § 7607(b)(1). The EPA's Denial Actions, affecting eighteen states within the geographical boundaries of eight different circuit courts, are nationally applicable, as they apply one consistent statutory interpretation and economic analysis to small refineries nationwide. This should have been the end of the Court's venue analysis, and venue is only proper in the D.C. Circuit.

**B.**

Alternatively, I would find that the Denial Actions should be transferred to the D.C. Circuit at step two of the venue analysis. They were "based on a determination of nationwide scope or effect" and the Administrator made and published the required determination. The plain meaning of the statute's key terms and this Circuit's precedents command this result.

"Determinations" are "the justifications the agency gives for the action and they can be found in the agency's explanation of its action. They are the reason the agency takes the action that it does."[18] "[T]he agency should identify the core determinations in the action."[19] Here, "[b]ecause the statute speaks of the determinations the action 'is based on,' the relevant determinations are those *that lie at the core* of the agency action."[20] Section 7607(b)(1), moreover, requires this Court look to the "scope" or "effect" of the relevant determination and determine whether it was "nationwide." In this context, "[s]cope" means "[t]he area covered by a given activity or subject," and "effect" means "[s]omething brought about by a cause or agent;

---

[18] *See Texas 2016*, 829 F.3d at 419.

[19] *Id.*

[20] *Id.*

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

result."[21] Altogether, this Court must then look to the core determinations that the EPA has identified as the justifications for the Denial Actions, and it must independently determine if they have nationwide scope or effect.

The EPA identified the two determinations at the core of the Denial Actions: (1) its new interpretation of the CAA's disproportionate hardship provision; and (2) its economic analysis of the nationwide market for RINs. The scope and effect of these core determinations are nationwide, as they are applicable to all small refineries no matter the location or market in which they operate.

The majority, however, takes issue with the EPA's identification of its core determinations. In their view, the EPA's core determinations for the Denial Actions are "flatly contradicted" by the agency's position on the merits. The majority faults the EPA for "consider[ing] each petition on the merits . . . and individual refinery information." But there is no contradiction in the EPA ensuring that its core determinations hold up when presented with potentially differing data in the individual petitions. While of course the agency considered and responded to the small refineries' comments (else, the action would have surely been arbitrary and capricious), there can be multiple determinations that influence an agency's actions. What the majority ignores is that for venue purposes, what matters are the EPA's *core* determinations. In the case of the Denial Actions, these determinations were of nationwide scope and effect. And because the Administrator made and published the required determination, venue is only proper in the D.C. Circuit.

## II.

_____

[21] *Id.* at 421 n. 20 & 21.

No. 22-60266
c/w Nos. 22-60425, 22-60433, 22-60434

There remains the matter of what our sister circuits have already done with this exact same case. The Third, Seventh, and Tenth Circuits transferred the relevant petitions to the D.C. Circuit, and the Ninth Circuit dismissed the petitions. No Circuit has kept the case for itself—until today.

Congress designed § 7607(b)(1) to "prioritize efficiency,"[22] and with the majority's decision today, this Court has impermissibly interfered with Congress's stated preference for "centralized review of national issues" over "piecemeal review . . . in the regional circuits."[23] To these eyes, its decision looks away from "general congressional direction in an attempt to do justice," an unfortunate overreach this day by my colleagues.[24] I must respectfully dissent.

---

[22] *Nat'l Ass'n of Mfrs.*, 583 U.S. at 130.

[23] *Texas 2011*, 2011 WL 710598, at *4.

[24] 41 Fed. Reg. 56767 (Dec. 30, 1976) (Comments of G. William Frick).